

125 BROAD STREET, 39TH FLOOR   NEW YORK, NEW YORK 10004-2400

www.sdma.com   212.422.0202 *phone*   212.422.0925 *fax*

*Aaron F. Mandel*
*212-898-4002*
*aaron.mandel@sdma.com*

December 8, 2009

*Via Electronic Filing and Federal Express*

Hon. Madeline Cox Arleo
United States District Court for the District of New Jersey
Martin Luther King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
Our File No.: 02331-085411

Dear Magistrate Judge Arleo:

We represent plaintiff Illinois National Insurance Company ("Illinois National") in the above-referenced action and seek the Court's assistance in resolving certain issues which have arisen with respect to defendants Wyndham Worldwide Operations, Inc. et al.'s (collectively, "Defendants") responses (the "Responses") to Illinois National's First Set of Requests for Production of Documents (the "Requests") and to Interrogatory No. 1 of its First Set of Interrogatories (the "Interrogatories").

As detailed below, Defendants have unilaterally restricted the Requests' temporal scope and inappropriately claimed privilege with respect to responsive documents. Accordingly, Illinois National requests that this Court: (i) reject Defendants' restriction of the Requests' temporal scope and order Defendants to respond with documents and information from 2001 to the present; and (ii) overrule Defendants' privilege objections and order them to produce documents responsive to the Requests.

## BACKGROUND

This dispute concerns whether non-owned aircraft liability insurance coverage is available to Defendants under Gold Medallion Comprehensive Business Aircraft Policy No. GM 1852800-05, issued by Illinois National to Jet Aviation International, Inc. ("Jet Aviation") for the period April 1, 2008 to April 1, 2009 (the "Illinois National Policy") for various wrongful death actions (the "Underlying Actions") arising out of the crash of an aircraft rented from a third-party by two Wyndham employees (the "Accident").

Illinois National contends that the Illinois National Policy was never intended to provide coverage to Defendants for non-owned aircraft[1] that was not operated by or used at the direction of Jet Aviation

---

[1] Generally, non-owned aircraft are either: (i) aircraft such as a rental aircraft that are not owned, in whole or in part, by insureds; or (ii) aircraft which are not listed in the policy declarations.

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
December 8, 2009
Page 2

Business Jets, Inc. ("Jet Business") and, therefore, no such coverage is available to Defendants for the Underlying Actions.[2] There is no dispute that Jet Business had no involvement in the rental of the aircraft involved in the Accident by Defendants' employees.

Defendants contend that they are entitled to "primary and non-contributory" coverage under the Illinois National Policy, in part, by virtue of an Aircraft Management Services Agreement entered into between Cendant Operations, Inc. -- Defendants' predecessor -- and Jet Business on or about December 19, 2001 (the "2001 Agreement").[3] Pursuant to the 2001 Agreement, Jet Business managed aircraft owned by Defendants and agreed to provide certain insurance for said aircraft.

## A. Illinois National's Requests and Defendants' Responses Thereto

### 1. Materials Dating Back to 2001

In part based on Defendants' contention that their entitlement to coverage under the Illinois National Policy was premised on the 2001 Agreement, Illinois National served document requests seeking information dating back to 2001 (*i.e.*, when the 2001 Agreement was entered into).[4] For example, the requests sought all documents and/or communications referring or relating to: (i) insurance policies obtained by or on behalf of Defendants in connection with the 2001 Agreement; (ii) insurance coverage available to Defendants under the insurance policies obtained by Jet Aviation in connection with the 2001 Agreement; and (iii) all insurance policies obtained by Defendants or on their behalf providing them with liability coverage for the use of non-owned aircraft. Defendants objected to each of these requests on the ground that they sought documents which were "irrelevant as to whether or to what extent Plaintiff owes coverage under the Illinois National Policy."[5] The earliest date of any of the documents which Defendants produced along with their Responses was March 30, 2006.

Interrogatory No. 1 asked Defendants to "[i]Identify all aircraft liability insurance policies (including but not limited to non-owned aircraft liability insurance) issued to [Defendants] from and after January 1, 2001."[6] Defendants again objected on the ground that Interrogatory No. 1 sought information which was "irrelevant as to whether or to what extent Plaintiff owes coverage under the Illinois National Policy," as well as purportedly being "overly broad, unduly burdensome, and not calculated to lead to the discovery of admissible evidence because it seeks the identification of insurance policies, including types of policies, that have no relevance to the interpretation of Plaintiff's policy at issue."[7] Notwithstanding these objections, Defendants identified policies issued in 2007 and 2008, including a 2007 policy issued to Defendants by

---

[2] *See* Ex. A at ¶¶ 24-31, 37-39.

[3] *See* Ex. B at ¶ 12.

[4] Ex. C at Request Nos. 12 through 20.

[5] Ex. D at Responses to Request Nos. 12 through 20.

[6] Ex. E at Interrogatory No. 1.

[7] Ex. F at Response to Interrogatory No. 1.

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.,* Case No. *2:09-cv-01724*
December 8, 2009
Page 3

StarNet Insurance Company ("StarNet") which, on its face, indicates it is a renewal of a policy issued in 2006.[8] Thus, there are clearly earlier responsive policies which Defendants refused to even identify.

### 2. The Kern Documents

The Requests also sought all documents and/or communications between Defendants and Robert M. Kern and/or the firm of Kern and Wooley LLP referring or relating to the Accident, Underlying Actions, the 2008-09 Illinois National Policy and/or the Managed Aircraft Endorsement attached to the Illinois National Policy (the "Kern Documents").[9] Mr. Kern and his firm are coverage counsel for Berkley Aviation ("Berkley"), which issued non-owned aircraft liability insurance coverage to Defendants between at least 2006 and 2009 through policies issued by StarNet, one of Berkley's member companies. Defendants simply objected to this request on the ground that it purportedly sought "information that is proprietary and/or protected by the attorney client, work product and/or common interest privileges."[10]

### 3. The CNA Report

Further, in response to Illinois National's request for "[a]ll Documents and/or Communications discussing insurance coverage available to you with respect to the Accident and/or the Underlying Actions"[11], Defendants referred Illinois National to the few documents which they produced with the Responses. In their privilege log, Defendants also listed a seven-page report prepared on or about August 6, 2008 by a CNA claims adjuster and which Defendants described as "[c]overage analysis, litigation analysis and status report prepared with information obtained from defense counsel" (the "CNA Report").[12] Defendants withheld the report on attorney-client privilege, work product doctrine and common-interest privilege grounds.

### B. The Parties' Meet and Confer Efforts

Following correspondence dated October 9 and 19, 2009,[13] the parties conferred by telephone over these issues on October 20, 2009 (the "October 20 Meet and Confer"). Defendants' counsel confirmed their position that information dating back to 2001 was irrelevant to resolving the matters at issue in this litigation, but proposed a time period for the Requests beginning in 2004 -- the year when Illinois National

---

[8] *See* Ex. G.

[9] Ex. C at Request No. 22.

[10] Ex. D at Response to Request No. 22.

[11] Ex. C at Request No. 7.

[12] Ex. H.

[13] Ex. I at 2; Ex. J. In order to avoid any confusion, all of the exhibits which were annexed to Exhibit I have been removed.

Case 2:09-cv-01724-JAG-MCA   Document 32   Filed 12/08/09   Page 4 of 9

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
December 8, 2009
Page 4

and affiliated companies first insured Jet Aviation.[14] By letter dated October 22, 2009, Illinois National rejected Defendants' proposal, noting that:

> Jet Aviation and Cendant Corp. [sic] entered into the [Agreement] in 2001 (December 19, 2001 to be precise). Accordingly, it is highly likely that any documents discussing, *inter alia*, the insurance provisions under the Agreement, Jet Aviation's and Wyndham's (Cendant's) understanding of what coverage was to be provided by the Jet Aviation policy and what coverage Wyndham (Cendant) would obtain for itself would have been generated in or about 2001. Your proposal of limiting the request to the period from 2004 to the present would not encompass documents pertaining to the time the Agreement was entered into and would only result in the production of documents and/or communications regarding renewals of previously-obtained policies. Lastly, there has been no suggestion that seeking materials dating back to 2001 imposes an undue burden on Defendants.[15] (Emphasis in original.)

The parties also did not resolve issues concerning Defendants' failure to produce the Kern Documents and withholding of the CNA Report. As respects the Kern Documents, the parties disagreed as to how documents and/or communications exchanged between Defendants and Mr. Kern, who Defendants' counsel confirmed represents Berkley and does not represent Defendants in either this action or the Undelrying Actions, could be protected under any privilege. Additionally, Illinois National questioned how any privilege applied to the CNA Report and/or any other information relating to potential coverage available to Defendants with respect to the Underlying Actions after counterclaiming that the Illinois National Policy provided Defendants with "primary and non-contributory" coverage.

Counsel additionally conferred on Defendants' response to Interrogatory No. 1. In e-mails dated November 10, 2009,[16] Defendants' counsel confirmed that Defendants' response to Interrogatory No. 1 was based upon the same limited temporal scope that they had unilaterally imposed in their responses to the document requests.[17]

## ARGUMENT

### A. Defendants' Unilateral Restriction on the Requests' Temporal Scope

Federal Rule of Civil Procedure 26 provides both that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and that "[r]elevant information need not be admissible at the trial if the discovery appears to be reasonably calculated to lead to the discovery of admissible evidence." Using both this broad benchmark of "relevance" as the controlling standard and Defendants' own positions in this litigation, Defendants' objections to discovery of documents referring or

---

[14] *See* Ex. K at 2.

[15] *Id.*

[16] *See* Ex. L at 1.

[17] *Id.*

Case 2:09-cv-01724-JAG-MCA   Document 32   Filed 12/08/09   Page 5 of 9

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
December 8, 2009
Page 5

relating to their aircraft liability coverage and other insurance policies obtained by Defendants providing non-owned aircraft liability coverage (because such coverage was not available to Defendants under Jet Aviation's policies) from the period 2001 through the present are meritless for at least four reasons.

First, Defendants themselves have placed the 2001 Agreement and related negotiations -- and, therefore, the parties' understanding of the terms and obligations of the 2001 Agreement and its insurance requirement -- directly at issue in this litigation. For example, Defendants responded to a request for all documents and/or communications on which Defendants base their claim that the Illinois National Policy provides them with "primary and non-contributing" coverage by stating that they "intend to rely on relevant documents and/or communications produced during the course of litigation, including but not limited to the Illinois National Policy and the ***Aircraft Management Services Agreement***."[18] Defendants similarly responded to an interrogatory seeking all facts supporting that same claim by expressly referring to the Agreement[19] and identified at least 8 witnesses in their initial disclosures who will allegedly offer testimony regarding the negotiations surrounding the 2001 Agreement as well as Defendants' interpretation of the requirements under the 2001 Agreement.[20] Accordingly, based on their own discovery responses and disclosures, Defendants' opposition to discovery of documents and information dating back to 2001 -- the year that the contract they intend to rely upon in order to support their counterclaim was entered into -- and their insistence that such information is irrelevant to this action is incredulous.

Second, putting aside Defendants' own repeated references to the 2001 Agreement, discovery of documents and information dating back to 2001 is potentially relevant to Illinois National's declaratory judgment and reformation claims. Specifically, in the event that the Court somehow determines that the Managed Aircraft Endorsement is ambiguous as respects Illinois National's coverage obligations, the relevant inquiry would focus on whether Defendants reasonably expected that the Illinois National Policy provided them with coverage for non-owned aircraft that was not operated by or at the direction of Jet Business. Moreover, evidence concerning the contracting parties' understanding of the terms of an insurance policy are relevent to Illinois National's claim for reformation of the Managed Aircraft Endorsement. Consequently, Defendants' understanding of the insurance coverage to be provided under the 2001 Agreement -- and, by implication, the Illinois National Policy -- may be necessary for purposes of resolving Illinois National's declaratory judgment and/or reformation claims and documents dating back to 2001 would certainly either be relevant to determining any reasonable expectations or be likely to lead to the discovery of admissible evidence.

Third, Defendants themselves have requested discovery dating back to 2001 in their requests to Illinois National. For example, Defendants' first set of document requests sought "all documents and/or communications relating to the procurement and issuance of aviation liability insurance coverage for Jet Aviation from 2001 to present, including, but not limited to, insurance applications, correspondence between [Illinois National] and Jet Aviation, quotes, binders, notes, and any other documents relating to Jet

---

[18] *See* Ex. C at Request No. 32.; Ex. D at Response to Request No. 32 (emphasis added; original emphasis omitted).

[19] *See* Ex. E at Response to Interrogatory No. 14.

[20] *See* Ex. M at 2-3.

Case 2:09-cv-01724-JAG-MCA Document 32 Filed 12/08/09 Page 6 of 9

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
December 8, 2009
Page 6

Aviation." By virtue of these document requests, Defendants effectively admit that documents dating back to 2001 are at least potentially relevant to resolving the issues in this litigation and/or likely to lead to the discovery of admissible evidence in connection with determining whether coverage is available under the 2008-09 Illinois National Policy.

Fourth, Defendants cannot seriously contend that it would be unduly burdensome for them to provide discovery dating back to 2001 -- a period of only eight years. To be sure, Illinois National's Requests were tailored as respects the particular documents and information pertaining to a limited subject matter: Defendants' aviation liability insurance coverage under policies either issued to them or Jet Aviation.

## B. Defendants' Inappropriate Privilege Claims

Defendants have contended that the Kern Documents and the CNA Report are protected by the attorney-client privilege, work product doctrine and/or common interest privilege. As detailed below, however, Defendants have not satisfied -- and cannot satisfy -- the burdens necessary to invoke these privileges.

### 1. Defendants' Attorney-Client Privilege Claims are Unfounded

Because the Court has diversity jurisdiction over this matter, New Jersey law controls the analysis of Defendants' attorney-client privilege claims. *Ngai v. Old Navy*, No. 07-5653, 2009 WL 2391282, *3 (D.N.J. July 31, 2009); *Robertson v. Cent. Jersey Bank & Trust Co.*, 834 F. Supp. 705, 707 (D.N.J. 1993). Under New Jersey law, the attorney-client privilege protects "communications between a lawyer and his client in the course of that relationship and in professional confidence." N.J.S.A. 2A:84A-20(1). The person asserting the privilege bears the burden of proving its application to a given communication and "to be considered privileged, the privilege holder must show that the communication 'initially be expressed by an individual in his capacity as a client in conjunction with seeking or receiving legal advice from the attorney in his capacity as such, with the expectation that it remain confidential.'" *Ngai*, 2009 WL 2391282 at *3 (*quoting Fellerman v. Bradley*, 493 A.2d 1239, 1242 (N.J. 1985)). Moreover, although the privilege "must be given as broad a scope as its rationale requires,"[21] New Jersey courts have recognized that the attorney-client privilege does not provide blanket protection to communications and/or documents exchanged between an insurer and its insured, noting that:

> ***no blanket privilege with respect to communications between an insured an [its insurer] should be countenanced.*** Rather the privilege should be held to shield communications between the insured and the [insurer] only where the communications were in fact made to the [insurer] ***for the dominant purpose of the defense of the insured by the attorney and where confidentiality was the reasonable expectation of the insured.*** *Pfender v. Torres*, 765 A.2d 208, 213 (App. Div. 2001) (*quoting State v. Pavin*, 494 A.2d 834, 837-38 (App. Div. 1985)) (emphasis added).

---

[21] *NL Indus., Inc. v. Comm'l Union Ins. Co.*, 144 F.R.D. 225, 229-230 (D.N.J. 1992) (citations omitted).

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
December 8, 2009
Page 7

It is clear that Defendants have not satisfied their burden under New Jersey law to demonstrate that the attorney-client privilege protects either the Kern Documents or the CNA Report from disclosure.

As respects the Kern Documents, and although Berkley has apparently arranged for Defendants' defense in the Underlying Actions, Defendants' bald privilege assertions do not satisfy their burden to demonstrate that the Kern Documents were exchanged "for the dominant purpose of the defense of the insured ... and where confidentiality was the reasonable expectation of the insured." *Id.* It is now undisputed that Mr. Kern is not Defendants' counsel. Initially, Mr. Kern sent Illinois National's claim adjuster a letter dated February 17, 2009 in which he advised both that he "represent[ed] Berkley Aviation, LLC, an insurer of Wyndham Worldwide" and that his firm's representation of Berkley was "limited to coverage issues...."[22] Although this letter appeared to place Mr. Kern in a potentially adverse position vis-à-vis Defendants, Mr. Kern sent another letter to Illinois National's counsel on May 4, 2009 cautioning against any direct communication with Defendants, claiming that "we represent [Defendants]."[23] As noted above, however, Defendants' counsel in this action confirmed that Mr. Kern only represents Berkley during the parties' October 20 Meet and Confer. As such, any documents and/or communications exchanged between Defendants and either Mr. Kern or his firm were not sent in the context of an attorney-client relationship and this Court should therefore find that the attorney-client privilege does not protect the Kern Documents from disclosure.

Defendants' characterization of the CNA Report as a "coverage analysis" similarly does not justify protecting it from disclosure on attorney-client privilege grounds. First, Defendants have not alleged that CNA is representing them in the Underlying Actions, has arranged for defense counsel to represent them in the Underlying Actions and/or is providing them with legal advice in connection with the Underlying Actions. Rather, it appears that the CNA Report is nothing more than an analysis of whether the Accident is covered under an insurance policy issued to Defendants by CNA (which Defendants have neither produced nor even identified). Defendants' counsel's contention during the parties' October 20 Meet and Confer that the CNA Report was an internal analysis of the Underlying Actions[24] appears to be disingenuous given that the CNA Report was prepared almost 6 months before any of the Underlying Actions was even filed.[25] Therefore, there is no basis on which to conclude that the CNA Report was prepared for purposes of providing Defendants with confidential legal advice and this Court should reject Defendants' attorney-client privilege claims.

---

[22] Ex. N at 1.

[23] Ex. O. Based upon this communication, Illinois National only sought documents and communication exchanged between Defendants and Mr. Kern and/or his firm prior to May 4, 2009. However, because it is now clear that Mr. Kern never represented Defendants, that date should be removed from Request No. 22.

[24] *See* Ex. K at 4.

[25] Upon information and belief, the earliest date that any of the Underlying Actions was filed was on or about February 4, 2009.

Case 2:09-cv-01724-JAG-MCA   Document 32   Filed 12/08/09   Page 8 of 9

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. *2:09-cv-01724*
December 8, 2009
Page 8

### 2. The Work Product Doctrine is Inapplicable

Unlike the attorney-client privilege, this Court's analysis of the work product doctrine is governed by federal law, which provides that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). Defendants have the burden of proving that the work product doctrine applies and can only do so by demonstrating that: (i) the document(s) for which protection is sought "can fairly be said to have been prepared or obtained because of the prospect of litigation"; and (ii) the document(s) were prepared primarily for the purpose of litigation. *La. Mun. Police Employees Retirement Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306-07 (D.N.J. 2008) ("documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work product doctrine"). Much like their bald assertions fail to establish that the attorney-client privilege protects the Kern Documents and CNA Report from disclosure, Defendants' work product claims are similarly insufficient.

Regarding the Kern Documents, Defendants have not included any responsive documents on a privilege log and it does not even appear that Defendants have searched for them. Rather, Defendants' objection simply appears to be a categorical one and Defendants provide no basis to conclude that any (let alone all) of the Kern Documents qualify for protection under the work product doctrine. Similarly, and as detailed above, Defendants' work product claim as respects the CNA Report is particularly specious given that Defendants' own description of the report suggests that it simply concerns whether coverage is available for the Accident under an as-of-yet undisclosed liability insurance policy issued to Defendants by CNA -- a purpose that comports more with CNA's regular course of business as opposed to having been prepared "because of" and/or "primarily for the purpose of" litigation. For these reasons, this Court should reject Defendants' work product claims with respect to the Kern Documents and CNA Report.

### 3. Defendants' Reliance on the Common Interest Privilege is Misplaced

Lastly, Defendants' "common interest" privilege claims do not justify their withholding of the Kern Documents and CNA Report. Under Third Circuit jurisprudence, the common interest privilege (now known as the "community of interest" privilege) "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." *In re Telegrlobe Commc'ns Corp.*, 493 F.3d 345, 364 (3d Cir. 2007). The privilege only applies: (i) if an underlying privilege has been established; (ii) if parties' legal interests are substantially similar; and (iii) if the documents relate to sharing information in order to coordinate legal strategies. *Id.*; *Cooper Health Sys. v. Virtua Health, Inc.*, --- F.R.D. ---, 2009 WL 2407413, *5 (D.N.J. Aug. 4, 2009). Defendants' common interest privilege claims do not satisfy any of these requirements.

As an initial matter, Defendants have not demonstrated that either the Kern Documents or the CNA Report qualify for protection under any underlying privilege and their failure to satisfy either of these privilege claims alone precludes withholding the Kern Documents and CNA Report from Illinois National.

Case 2:09-cv-01724-JAG-MCA Document 32 Filed 12/08/09 Page 9 of 9

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
December 8, 2009
Page 9

But even if this Court had to analyze the common interest privilege's other two prongs, Defendants' common interest privilege claims would similarly fail.

For one, this Court has noted that "the interests of [an] insurer and its insured with respect to the issue of coverage *are always adverse*"[26] and, to the extent that the Kern Documents and CNA Report address whether coverage is available to Defendants under the StarNet Policies and/or the as-of-yet undisclosed CNA policy for either the Accident or the Underlying Actions, Defendants' legal interests cannot be sufficiently aligned with either Berkley's or CNA's as a matter of law. Additionally, Defendants have not established that the Kern Documents and/or CNA Report were exchanged for purposes of sharing information in order to coordinate legal strategy. Rather, as detailed above, Defendants have not listed any of the Kern Documents on any privilege log (thereby making it is impossible to know their subject matter) and their description of the CNA Report suggests that it was prepared for purposes of analyzing whether coverage was available to Defendants for either the Accident or the Underlying Actions under an undisclosed insurance policy issued to Defendants by CNA. Therefore, it does not appear that the common interest privilege protects either the Kern Documents or the CNA Report.

## CONCLUSION

Based on the foregoing, Illinois National respectfully requests that this Court: (i) order that Defendants are required to produce documents responsive to the Requests which date back to 2001 and (ii) reject all of Defendants' privilege claims in connection with the Kern Documents and CNA Report and order Defendants to produce those documents.

Respectfully submitted,

Aaron F. Mandel
Sedgwick, Detert, Moran & Arnold LLP

cc: Andrew T. Houghton, Esq. (via e-mail)
Justin N. Kinney, Esq. (via e-mail)
Danielle DeFilippis, Esq. (via e-mail)

---

[26] *N. River Ins. Co. v. Phila. Reinsurance Corp.*, 797 F. Supp. 363, 367 (D.N.J. 1992) (emphasis added).