125 BROAD STREET, 39TH FLOOR   NEW YORK, NEW YORK 10004-2400

www.sdma.com   212.422.0202 phone   212.422.0925 fax



*Andrew T. Houghton*
*212-898-4036*
*andrew.houghton@sdma.com*

March 9, 2010

*Via Electronic Filing and Federal Express*

Hon. Madeline Cox Arleo
United States District Court for the District of New Jersey
Martin Luther King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
   Our File No.: 02331-085411

Dear Magistrate Judge Arleo:

On behalf of plaintiff Illinois National Insurance Company, we oppose Defendants' March 2, 2010 request to stay discovery and for leave to file a motion for summary judgment and motion to dismiss.

## PRELIMINARY STATEMENT

Illinois National filed this case in April 2009. As of today, Illinois National has been provided with only a small amount of discovery from Wyndham. Defendants responded to Illinois National's First Set of Document Requests – served in June 2009 – by producing a small stack of documents that fit into a redweld file, containing only the barest and most basic materials (the underlying contract between Jet Aviation and Wyndham, the subject policy and prior policy, a StarNet policy, the underlying complaints and certain other records).

In response to Wyndham's objections and refusal to produce anything beyond its barebones disclosure, plaintiff filed motions to compel. While those motions were pending, in January 2010, Wyndham substituted its counsel. As a result, at the status conference on January 27, 2010, it was granted the month of February to allow counsel to familiarize themselves with the file and, more importantly, to allow the parties to confer towards resolving the outstanding discovery issues. Unfortunately, Illinois National's efforts to engage Wyndham to resolve the discovery disputes were avoided until a conference call was finally scheduled for March 2nd. Following the extended silence during the entire month of February – and just hours before the March 2nd conference call – Wyndham filed its letter requesting a stay of all discovery, and for leave to file dispositive motions.

NY/561000v1

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al., Case No. 2:09-cv-01724*
March 9, 2010
Page 2

Wyndham filed this request after having itself previously obtained extensive discovery from Illinois National, which required considerable effort and cost to collect, review and produce.[1] Against this backdrop, Defendants' March 2 request appears to be nothing more than an effort to continue the strategy pursued since the commencement of this litigation: to avoid meaningful discovery on the parties' intentions regarding the non-owned aircraft coverage under Illinois National's policy, which goes to the heart of the plaintiff's reformation claim.[2] The inequity of Defendants' request to stop discovery in its tracks, after having obtained a substantial amount of discovery from Illinois National, and having obstructed discovery and withheld plainly relevant documents (see Illinois National's letter filed January 13, 2010), warrants denial of Wyndham's request.

Putting aside their obstruction, however, Defendants' contentions that they should be granted leave to file dispositive motions because either discovery is unnecessary or because their motions have "the potential to significantly limit the relevant factual issues" are disingenuous. The predominant issue in this action, regardless of whether Defendants prevail on their claim that they are entitled to coverage under the current language of the Policy, is Illinois National's claim for reformation. Courts acknowledge that resolving a reformation claim is a fact-intensive inquiry, thus necessarily requiring discovery. Additionally, Defendants' interpretation of the Policy would not support summary judgment in their favor given that their interpretation is wholly unreasonable; the best Defendants can hope for is that this Court concludes that their reading of the policy is reasonable (which it is not), creating an ambiguity to be resolved based upon extrinsic evidence. Despite its arguments and mischaracterization of the claim, Wyndham should not be permitted to avoid the discovery that Illinois National is entitled to and which is long overdue.

## BACKGROUND

### A.   The Jet Aviation/Wyndham Services Agreement

Plaintiff Illinois National provided insurance to Jet Aviation Business Jets, Inc. ("Jet Aviation"), a business aviation services company. Among other things, Jet Aviation provides aircraft management services to companies owning aircraft. One of those companies is Wyndham, the defendants herein. As set forth in the Complaint, in December 2001, Wyndham's predecessor, Cendant Operations, Inc. ("Cendant") and Jet Aviation entered into an Aircraft Management Services Agreement to provide for Jet Aviation's management of Wyndham's aircraft (the "Jet Aviation/Wyndham Agreement").

The Jet Aviation/Wyndham Agreement provided that Wyndham could elect to insure its aircraft through Jet Aviation's fleet insurance policy. Wyndham did precisely that, for every year beginning in 2001, when the

---

[1] In response to Wyndham's requests, Illinois National has produced the non-privileged portions of the claims file for this matter and the underwriting files for the policy periods spanning 2004 through 2008/09.
[2] It remains unclear whether Wyndham will finally comply with discovery of documents and information that is plainly relevant to the issues in this coverage litigation. For example, in the March 2nd conference call, Wyndham's counsel indicated that they were "prepared to recommend" that Wyndham search for and produce documents dating back to 2001 (when the Jet Aviation/Wyndham Agreement was signed). Evidently, no such search has been conducted to date. If Wyndham accepts its counsel's recommendation, counsel advises that it may be another 30 to 45 days before the results of any search are known. Obviously, this falls short of a commitment by Defendants to comply with the outstanding discovery.

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
March 9, 2010
Page 3

Agreement was signed. Thus, for each policy year – 2001-2002, 2002-2003, 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008 and 2008-2009 – Wyndham's aircraft were insured under Jet Aviation's policies.

### B. The Illinois National Policies

Illinois National (or affiliates) began issuing these policies to Jet Aviation for the 2004-2005 policy period. As to Wyndham, coverage available to the owners of aircraft managed by Jet Aviation (identified in these policies as "Insured Owners") was documented pursuant to an endorsement called the "Managed Aircraft Endorsement." For each policy year (2004-05, 2005-06, 2006-07, 2007-08 and 2008-09), Wyndham received a copy of the policy, and was billed for the premium attributable to its aircraft. The premium Wyndham paid was for a variety of coverages for their $26 million aircraft, including hull (property) insurance and numerous types third-party liability coverages.

#### 1. The Managed Aircraft Endorsement

The Managed Aircraft Endorsement serves the purpose of confirming that the first Named Insured, Jet Aviation, has a business relationship with a third party, such as Wyndham, and that said third party owns aircraft which is identified therein (thus referred to as an "Insured Owner"), which will be managed by Jet Aviation under the parties' agreement. With those parameters in place, i.e., the management of that aircraft by Jet Aviation, coverage is therefore provided to Wyndham, pursuant to the terms and conditions of the policy.

One of the terms, at issue here, is an exclusion in the Endorsement, which precludes coverage for any aircraft not owned by Wyndham, referred to as "non-owned aircraft."[3] Accordingly, no coverage is provided for aircraft that are not owned by Wyndham (and not identified on the policy). The exception to this exclusion provides coverage, if such aircraft was operated by or used at the direction of Jet Aviation.[4] Since the insured with whom the insurer had a direct relationship, Jet Aviation (as the provider of aircraft management services to Wyndham), would have involvement in the usage of the aircraft, the rationale for the policy's limited coverage to Wyndham (involvement of Jet Aviation as its service provider) would be met. Without that connecting link between a non-owned aircraft and Jet Aviation, the policy becomes a free-for-all from Wyndham's perspective. That kind of unfettered coverage was never negotiated or intended by anyone. Wyndham has always known that, as it independently purchased that non-owned aircraft coverage separately, from another insurer (in this case, a separate policy issued by StarNet Insurance Company and adjusted by Berkley Aviation ("StarNet/Berkley").

Thus, it is significant that during the years up to and including 2008 – because Jet Aviation's policies did not provide coverage to Wyndham for non-owned aircraft except in the limited circumstances where operated by or used at the direction of Jet Aviation – Wyndham obtained non-owned aircraft coverage through separate policies (most recently from StarNet/Berkley, whom Wyndham has admitted is controlling its

---

[3] Generally, non-owned aircraft coverage protects an insured from liability arising from aircraft that it uses but which the insured does not own.
[4] For example, if Wyndham's aircraft was not available when needed, an alternate aircraft could be arranged by Jet Aviation.

Case 2:09-cv-01724-JAG -MCA   Document 50   Filed 03/09/10   Page 4 of 14

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.,* Case No. 2:09-cv-01724
March 9, 2010
Page 4

defense in this litigation). There is no mention of this in Wyndham's March 2nd request to stop the discovery process. Wyndham, a sophisticated business enterprise represented by one of the largest brokers in the world, Aon, was fully aware that the Jet Aviation policies did not provide Wyndham non-owned aircraft coverage unless the aircraft was operated by or used at the direction of Jet Aviation. The Jet Aviation/Wyndham Agreement did not require that Jet Aviation provide non-owned aircraft coverage and Wyndham never sought such coverage from Jet Aviation. Because of this, Wyndham obtained *that* coverage from other insurers, including StarNet/Berkley, to whom coverage for the underlying litigation was tendered (another fact which Wyndham omits its March 2nd request).

2. **The Drafting Error in the 2008 Policy**

For each policy year and continuing until 2008, the two basic aspects of the coverage obtained pursuant to the Jet Aviation/Wyndham Agreement remained fundamentally the same: (1) Wyndham had liability coverage for its own aircraft; and (2) Wyndham did not have coverage for non-owned aircraft, unless it was operated by or used at the direction of Jet Aviation.

These fundamental aspects of the coverage remained in place until 2008, when (as alleged in the complaint), an unintended drafting error resulted in wording that, Wyndham argues, suddenly affords it coverage for any aircraft it uses anywhere in the world – with or without Jet Aviation's involvement – an amazing claim, but one which Wyndham (or rather, its insurer who provides that precise coverage, StarNet/Berkley) suggested for the first time after the underlying accident occurred.

The error in the 2008 Policy was as follows. As mentioned, in the Managed Aircraft Endorsement, a provision excluded coverage for non-owned aircraft unless it was "operated by or used at the direction of Jet Aviation Business Jets, Inc." In 2008, the reference to "Jet Aviation" was substituted with the term "Named Insured" to create a single Managed Aircraft Endorsement that could be used in connection with Aircraft Management Service Agreements that might be entered into by other Jet Aviation entities (in addition to "Jet Aviation Business Jets, Inc."). There was no intention, however, to expand the availability of non-owned aircraft coverage under Jet Aviation's Policy to aircraft operated by or used at the direction of parties other than Jet Aviation entities.

Wyndham has now seized on that mistake in support of its argument that it is entitled to coverage for liabilities arising out of non-owned aircraft operated by or used at the direction *of itself* – not Jet Aviation, despite the fact that the Managed Aircraft Endorsement as a whole otherwise consistently distinguished between "Insured Owners" such as Wyndham and the "Named Insured," referring to Jet Aviation. The argument makes no sense and is fundamentally at odds with the successive, year-to-year coverage that was in place during each of the prior policy periods mentioned above.

3. **Discovery Will Establish the Parties' Intentions Warranting Reformation**

There was never any intention to cover Wyndham under Jet Aviation's policy for liability arising from the use of aircraft having no connection to Jet Aviation. The incredible windfall sought by Wyndham (or by its non-owned aircraft liability insurer, StarNet/Berkley) was never any parties' intent – neither Jet Aviation's, its broker's, Illinois National's, nor even Wyndham's intent. Plaintiff therefore seeks a reformation of the Policy to correct that mistake based upon the parties' mutual intentions.

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
March 9, 2010
Page 5

One of the best indications of the parties' intentions are the successive policies procured by Jet Aviation for Wyndham pursuant to the Jet Aviation/Wyndham Agreement, in the years following the execution of the Agreement. Accordingly, documents regarding the prior policy years, during which the coverage remained the same from one year to the next, is probative of the parties' intention that the coverage for the 2008-2009 policy was the same as the coverage that was in place for all of the prior years. In fact, Wyndham admits in their Answer that no expansion of coverage was sought in 2008. These documents will clearly establish a basic consistency: none of the policies ever provided coverage to Wyndham for non-owned aircraft unless they were operated by or used at the direction of Jet Aviation. To date, Wyndham has vigorously resisted all discovery that will establish these facts.

Here, there is no dispute that Jet Aviation had no connection with the aircraft involved in the underlying accident, which was rented by two Wyndham employees, apparently without even Wyndham's knowledge. There was no intent by any party that the Jet Aviation Policy would respond to such an accident, nor any logical reason why such an accident should fall within the coverage of Jet Aviation's Policy.

Indeed, on April 21, 2008, just three months before the accident, Wyndham's broker, Aon, confirmed to Wyndham that the prior period's coverage provided through Jet Aviation and the non-owned aircraft coverage obtained separately by Wyndham from the StarNet/Berkley policy were not overlapping. As stated by Wyndham's broker:

> [T]he Jet Aviation policy excludes "any Non-Owned Aircraft unless such Non-Owned Aircraft is operated by or used at the direction of Jet Aviation Business Jets, Inc." The Non-Owned policy that we place for you with [StarNet] Berkley Aviation (Policy #BA07N1038S), covers ANY Non-Owned Aircraft having a seating capacity not to exceed 50 total seats, anywhere in the world.

(See Exhibit A hereto).

It is worth noting that this document has *not* been produced by Wyndham, nor was any other related correspondence. This email was produced by Wyndham's broker. Having admitted in its Answer that Wyndham never sought an expansion of the coverage under the Jet Aviation Policy and having continued to renew its separate coverage from StarNet/Berkley for 2008, Wyndham's (and StarNet/Berkley's) adamant assertions that Wyndham "has clear and established rights" under Jet Aviation's Policy should be suspect, as should its claim that discovery should be stayed, as discussed further below.

## ARGUMENT

### A.    Discovery Is Necessary to Resolve These Claims

Seeking to portray Illinois National' claim as futile such that Wyndham should not have to be bothered with discovery, Wyndham overstates the criteria for reformation as being "denied in all but the most extreme circumstances." This is simply not the case. The standard is virtually uniform across jurisdictions. Generally, reformation is warranted where there is clear and convincing proof "that the contract in its reformed, and not original form is the one that the contracting parties understood and meant it to be; and as, in fact, it was but for the alleged mistake in its drafting." Paparone Housing Co., Inc. v. Wynford Group, 2008 WL 106677 at *10 (N.J. Super. Ct. App. Div Jan. 11, 2008). In fact, in circumstances instructive to those at hand reformation has been granted. See Cabs, Inc. v. Hartford Ins. Group, 151 Fed. Appx. 604,

Case 2:09-cv-01724-JAG -MCA   Document 50   Filed 03/09/10   Page 6 of 14

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. 2:09-cv-01724
March 9, 2010
Page 6

2005 WL 2093009 (10th Cir. Aug. 31, 2005) (reformation granted where contracting parties did not intend to extend coverage to parent company's fleet of cabs when changing identification of named insured); see also OneBeacon America Ins. Co. v. Travelers Indem. Co. of Illinois, 465 F.3d 38 (1st Cir. 2006).

But, more importantly, what is clear from the foregoing cases and virtually all cases addressing reformation is that the determination is fact intensive and discovery is necessary to allow a party seeking reformation to meet its burden. In resolving a claim for reformation, the courts will review extrinsic evidence in order to evaluate the mistake and the actual intent of the parties. See OneBeacon, 465 F.3d at 41 ("In a reformation case, it does not matter that a contract unambiguously says one thing. A court still will accept extrinsic evidence in evaluating a claim that both parties to the contract intended it to say something else."). Accordingly, courts will look at a wide variety of evidence to determine whether reformation is warranted, including:

- Contractual agreements addressing insurance. See OneBeacon, 465 F.3d at 43;

- Prior course of conduct. Young, 2009 WL 3677350 at *44 ("A long and consistent course of dealing is further objective evidence of a mutually understood agreement. Course of dealing evidence is particularly reliable in contract interpretation because the credibility of such evidence is 'not a function of the self-serving testimony of a party to the contract.' The history between the parties will demonstrate what they believed their written agreement was, even if a scrivener's error resulted in the actual written terms differing from that understanding.").

- Testimony of the insured. See Cabs, Inc., 151 Fed. Appx. at 610-11, 2005 WL 2093009;

- Testimony of the insured's broker. See OneBeacon, 465 F.3d at 43; Cabs, Inc., 151 Fed. Appx. 604, 2005 WL 2093009;

- Testimony of the insurer's underwriter or representative. See OneBeacon, 465 F.3d at 43; Cabs, Inc., 151 Fed. Appx. at 611, 2005 WL 2093009;

- Other insurance purchased by the insured. See OneBeacon, 465 F.3d at 45;

- Premiums paid. See Cabs, Inc., 151 Fed. Appx. at 612, 2005 WL 2093009; Twin City Fire Ins. Co. v. Pittsburgh Corning Corp., 83 F.Supp. 1147, 1150 (W.D.Pa. 1992); Great Atlantic Ins. Co. v. Liberty Mut. Ins. Co., 576 F. Supp. 561, 563 E.D.Mis. 1983).

Thus, a party seeking to meet the burden of justifying reformation based upon evidence such as that outlined above must be afforded the opportunity to gather such evidence through discovery.

  **B.**  **Wyndham's Arguments for Seeking a Stay of Discovery and Leave to File Dispositive Motions Are Meritless**

In addition to suggesting that the prospect of an insurer obtaining reformation is so futile that discovery is unnecessary, Defendants make a host of misplaced arguments as to why they should be granted leave to file dispositive motions while discovery is stayed. Specifically, Defendants contend that: (i) Illinois National has not complied with the pleading requirements of Federal Rule of Civil Procedure 9(b); (ii) there was no mutual mistake as to the intent of the coverage supposedly provided by the Illinois National Policy; (iii)

Case 2:09-cv-01724-JAG -MCA   Document 50   Filed 03/09/10   Page 7 of 14

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. *2:09-cv-01724*
March 9, 2010
Page 7

reformation of an insurance policy is unavailable following an occurrence; and (iv) Illinois National specifically cannot obtain reformation because it was careless in drafting the Endorsement. None of these arguments supports granting Defendants' request to stop discovery and for leave to file dispositive motions.

1. **Illinois National Properly Pleaded Its Reformation Claim**

Defendants' request for leave to file a motion to dismiss rests on its faulty contention that Illinois National has not pleaded its reformation claim with the requisite particularity under Federal Rule of Civil Procedure 9(b). The cases relied upon by Wyndham are inapplicable since they concern allegations of fraud. Illinois National's complaint alleges a mutual mistake, not fraud. In the few instances where Rule 9(b) has been applied to reformation based upon mutual mistake, recent decisions have recognized that the standard for alleging fraud has questionable applicability to allegations of mistake. See Hartford Cas. Ins. Co. v. Moore, 2010 WL 323502 at *6 (C.D. Ill Jan. 20, 2010) ("Though allegations of mistake are within the rule, the Seventh Circuit has expressed doubt as to whether mistake need be pled with the same particularity as fraud, as allegations of mistake do not raise the same concerns as those present with allegations of fraud."); Mastec North America, Inc. v. Coos County, 2006 WL 176653 at *9 (D.Or. Jan. 24, 2006) (finding that the heightened pleading standard for fraud does not apply to claim for reformation based upon mutual mistake).

In any case, Illinois National complaint adequately alleges the mistake in the Endorsement, when it occurred, and that it does not comport with the intent of any party involved. Insofar as the goal of Rule 9(b) is to apprise the opposing party of the nature of the claim, Illinois National's complaint satisfies this requirement.

2. **Wyndham Cannot Claim "No Mutual Mistake" As A Matter Of Law**

Defendants argue "even with[ ] further discovery, Illinois National cannot show by clear and convincing evidence that there was a 'mutual mistake' with Wyndham." This argument appears to be based on an assertion that "there can be no 'mutual mistake' in the drafting of the Policy without the knowledge or involvement of Wyndham." Besides considerable assumptions regarding the facts to be developed in discovery, Wyndham misconstrues the analysis to be made by the Court of the "mutual mistake." Wyndham cannot by itself preclude a finding of mutual mistake by (self-servingly) claiming it had no involvement. The court can find a mutual mistake between the "contracting parties" to a contract (i.e. Jet Aviation, its broker, and Illinois National). See Paparone, 2008 WL 106677 at *10 (reformation restores the contract to what the contracting parties understood and meant it to be). For example, in Cabs, Inc., 151 Fed. Appx. 604, 2005 WL 2093009 at *5, the court found reformation was warranted based upon the intent of the original contracting parties, Centennial and Hartford, not that of Centennial's parent claiming coverage. Moreover, Wyndham's own knowledge can be relevant where, as here, Wyndham was operating on the same understanding as the other parties with respect to the intended scope of coverage to be provided. See Young, --- F. Supp. 2d ---, 2009 WL 3677350 at *42 (mutual mistake where party claiming benefits is on notice of or shared understanding of original intent). Here, as discovery will show, the coverage provided to Wyndham under Jet Aviation's Policy for several years prior to the mistake consistently did not include the non-owned coverage Wyndham now claims. Further, Wyndham has

Case 2:09-cv-01724-JAG -MCA   Document 50   Filed 03/09/10   Page 8 of 14

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al.*, Case No. *2:09-cv-01724*
March 9, 2010
Page 8

admitted it had never sought an expansion of the coverage that was provided in the prior years,[5] in which it obtained non-owned aircraft coverage separately from StarNet/Berkley.

### 3. There is No Prohibition of Reformation Following an Occurrence

Defendants' contention that Illinois National is not entitled to reformation after an occurrence is not supported by law. None of the authority cited by Wyndham stands for such a rule and the cases are readily distinguishable as reformation was denied for various other reasons. See, e.g., Mission Ins. Co. v. Guarantee Ins. Co., 683 P.2d 215, 218-19 (Wash. Ct. AP.. 1984) (omnibus clause approved by state insurance commissioner could not be modified); Public Employees Mut. Ins. Co. v. Mucklestone, 758 P.2d 987, 988 (Wash. 1988) (no reformation claim asserted); Monroe Guaranty Ins. Co. v. Langreck, 816 N.E.2d 485, 490-92 (Ind. Ct. App. 2004) (finding unilateral mistake and no basis for reformation). To the contrary, where reformation is otherwise warranted in view of the evidence presented, the fact that reformation is sought following an occurrence is not a bar to relief. See, e.g., Cabs, Inc., 151 Fed. Appx. 604, 2005 WL 2093009 (reformation granted after claim for injury to pedestrian); OneBeacon, 465 F.3d 38. Moreover, having obtained non-owned coverage through StarNet who is defending both the underlying wrongful death actions and this coverage action, Wyndham cannot claim any sort of detrimental reliance or estoppel based upon the purported coverage it now claims to also have under the Jet Aviation Policy.

### 4. Alleged "Carelessness" Does Not Bar Reformation

Defendants further claim that Illinois National's reformation claim can be disposed of on summary judgment and without the need for additional discovery because of what it assumes is Illinois National's alleged "carelessness" in drafting the Managed Aircraft Endorsement. The 1954 case relied on by Defendants, Milhurst Milling & Drying Co. v. Auto Ins. Co., 31 N.J. Super. 424 (App. Div 1954), is wholly inapplicable and does not stand for the proposition that reformation is barred by the policy drafter's lack of diligence. There, an insured alleging a *unilateral* mistake on his part and inequitable conduct by his insurer was not entitled to seek reformation where he admitted he had not read the policy. Even then, the Milhurst court noted that the particular circumstances of the mistake were determinative.

Contrary to what Defendants would have this Court believe, the supposed "rule" that negligence bars reformation is also contrary to established law. For example, in Young, the United States District Court for the Northern District of Illinois explained why negligence does not bar reformation:

> When a party seeks reformation of an instrument due to mistake, courts will not ordinarily deny relief even if that party was negligent. "It is obvious that negligence itself is not a defense to reformation, since there would then be no ground for reformation because of a mutual mistake, inasmuch as mistakes nearly always pre-suppose negligence." In order to

---

[5] Wyndham relies upon this allegation in Illinois National's Complaint to argue that Illinois National "categorically denied" Wyndham had knowledge or involvement in the Policy drafting. Wyndham's distortion of the allegation fails. The fact that Wyndham did not seek expanded coverage is not evidence that it was not involved. Illinois National's allegation is merely that Wyndham never asked for an expansion of the limited coverage it had, and Wyndham has admitted this fact.

> bar equitable relief, a party's negligence must be "gross," that is, it must "amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing." This language indicates a much higher standard than simple negligence – it rises to the level of willful behavior where a party has knowingly acted in bad faith.

--- F. Supp. 2d ---, 2009 WL 3677350 at *50 (citations omitted). See also Twin City, 813 F. Supp. at 1151 ("reformation is not barred by negligent conduct"). Defendants do not contend -- and, indeed, have not even suggested -- that Illinois National exercised its "responsibility to take care in the drafting of its own policies" in a grossly negligent manner.

### C. The Illinois National Policy Does Not Provide Coverage to Defendants for the Accident

Aside from the numerous, unavailing arguments detailed above, Defendants contend that they should be granted leave to stay discovery and file a premature summary judgment motion because "it cannot be disputed that the Policy's plain language provides coverage for the rented Cessna aircraft that crashed on August 4." Defendants base their argument on a phrase in a single sentence in paragraph 5 of the Endorsement, which excludes coverage for non-owned aircraft unless it is "operated by or used at the direction of a Named Insured." Such an interpretation, however, renders the distinction throughout the remainder of the Endorsement between "insured owners" and "named insureds" and the limitation of non-owned coverage meaningless. The only reasonable interpretation of the Endorsement would be to read "Named Insured" as only referring to Jet Aviation. Because Defendants' reading of the Endorsement is not reasonable or, at best creates an ambiguity as to the meaning of its language, this ground could not support granting Defendants summary judgment and, thus, similarly cannot support granting them leave to file a summary judgment motion prior to the completion of discovery.

In the event this Court were to find Defendants' interpretation of the Endorsement to be reasonable (which it is not), the best Defendants could hope for is that the Endorsement is declared ambiguous, in which case the relevant inquiry would turn to whether Defendants reasonably expected that the Policy would provide them with coverage for losses in connection with non-owned aircraft neither operated by nor used at the direction of Jet Aviation. In that case, Illinois National would be entitled to demonstrate that Defendants could never have reasonably expected such coverage through extrinsic evidence -- evidence which could only be obtained through discovery.

### CONCLUSION

The Court's Pre-Trial Order provides that dispositive motions shall not be filed until after the completion of discovery. Here, Wyndham has made every effort to avoid discovery that is plainly necessary. There is simply no basis upon which to grant Wyndham's request for leave to file dispositive motions and stay discovery. Wyndham's motion should be denied.

Respectfully submitted,

*/s/ Andrew T. Houghton*

Andrew T. Houghton
Sedgwick, Detert, Moran & Arnold LLP

Hon. Madeline Cox Arleo
Re: *Illinois National Insurance Company v. Wyndham Worldwide Operations, Inc., et al., Case No. 2:09-cv-01724*
March 9, 2010
Page 10

cc:    Michael David Lichtenstein, Esq. (via e-mail)
       Christopher S. Porrino, Esq. (via e-mail)

# Exhibit A

Case 2:09-cv-01724-JAG -MCA   Document 50   Filed 03/09/10   Page 11 of 14



Mathew Sopchyk/IL/ARS/US/AON
04/21/2008 02:34 PM

To "Barron, Stephen" <Stephen.Barron@wyndhamworldwide.com>
cc "Mathew Sopchyk" <Mathew_Sopchyk@ars.aon.com>, "Vincent Boneski" <Vincent_Boneski@ars.aon.com>, "Vince Bell" <Vince_Bell@ars.aon.com>
bcc
Subject RE: Aviation Policy review  [Virus Checked]

Steve,

As a follow-up to our conversation on Friday afternoon, the Jet Aviation policy excludes "any Non-Owned Aircraft unless such Non-Owned Aircraft is operated by or used at the direction of Jet Aviation Business Jets, Inc." The Non-Owned policy that we place for you with Berkley Aviation (Policy #BA07N1038S), covers ANY Non-Owned Aircraft having a seating capacity not to exceed 50 total seats, anywhere in the world. This policy is an excess policy and would become excess above Jet Aviation's policy in the event that the Non-Owned Aircraft is operated by or used at the direction of Jet Aviation.

If you come across the lease agreement for the N801WW, please forward and I would be happy to review. In the meantime, if you need anything else, please let me know.

Thanks,
Matt


**Matt Sopchyk**
**Assistant Vice President**
**Aon Aviation**
**Office:** 312.381.4613
**Mobile:** 312.489.3006
**Fax:** 312.381.6363



"Barron, Stephen" <Stephen.Barron@wyndhamworldwide.com>



"Barron, Stephen" <Stephen.Barron@wyndhamworldwide.com>
04/18/2008 03:14 PM

To "Mathew Sopchyk" <Mathew_Sopchyk@ars.aon.com>
cc "Vincent Boneski" <Vincent_Boneski@ars.aon.com>, "Vince Bell" <Vince_Bell@ars.aon.com>
Subject RE: Aviation Policy review  [Virus Checked]


I just called your office. I will call your cell now

**From:** Mathew Sopchyk [mailto:Mathew_Sopchyk@ars.aon.com]
**Sent:** Friday, April 18, 2008 4:14 PM
**To:** Barron, Stephen

ARSC 325

**Cc:** Vincent Boneski; Vince Bell
**Subject:** Re: Aviation Policy review [Virus Checked]

Are we doing a call now?

Matt Sopchyk
Assistant Vice President
Aon Aviation
Office: 312.381.4613
Mobile: 312.489.3006

----- Original Message -----
**From:** "Barron, Stephen" [Stephen.Barron@wyndhamworldwide.com]
**Sent:** 04/18/2008 10:38 AM AST
**To:** Mathew Sopchyk
**Cc:** Vincent Boneski; Vince Bell
**Subject:** RE: Aviation Policy review [Virus Checked]

Mathew,

I think you saw from my earlier email that the premium on the other policy was due today. As such, I was hoping that we could have had some baseline comparison between the policies by today. In any case, can we discuss around 4pm EST today?

Steve

**From:** Mathew Sopchyk [mailto:Mathew_Sopchyk@ars.aon.com]
**Sent:** Friday, April 18, 2008 10:35 AM
**To:** Barron, Stephen
**Cc:** Vincent Boneski; Vince Bell
**Subject:** Re: Aviation Policy review [Virus Checked]

Steve,
I left you a voicemail on Tuesday on the attached.
I am out of the office today, but if its urgent I can handle it after lunch, otherwise I can send you something first thing Monday morning.

Matt Sopchyk
Assistant Vice President
Aon Aviation
Office: 312.381.4613
Mobile: 312.489.3006

----- Original Message -----

**From:** "Barron, Stephen" [Stephen.Barron@wyndhamworldwide.com]
**Sent:** 04/18/2008 10:17 AM AST
**To:** Mathew Sopchyk
**Cc:** Vincent Boneski; Vince Bell
**Subject:** RE: Aviation Policy review  [Virus Checked]

Mathew,

Can I get your coverage comparison today please?

Thanks

Steve


**From:** Barron, Stephen
**Sent:** Tuesday, April 15, 2008 9:38 AM
**To:** Mathew Sopchyk
**Cc:** 'Vincent Boneski'
**Subject:** Aviation Policy review
**Importance:** High

Mathew,

I need you to help me conduct a review of a jet aviation policy that was purchased by our CEO. I would like to see if we have any duplicative coverage against our non-owned aviation policy. I will be sending a PDF of the jet policy to your attention today. Premium is due on 4/18 so your prompt review is appreciated. Thanks.

Steve

**Stephen Barron**
Risk Management & Insurance
Wyndham Worldwide
7 Sylvan Way
Parsippany, NJ 07054
Tel: (973) 753-6573
Fax: (973) 753-6730
Cell: (201) 675-0428
email: stephen.barron@wyndhamworldwide.com

*For every kind of traveler. For every kind of trip.*   www.WyndhamWorldwide.com

The information in this electronic mail ("e-mail") message may contain information that is confidential and/or privileged, or may otherwise

ARSC 327