### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ILLINOIS NATIONAL INSURANCE COMPANY,**<br><br>       **Plaintiff,**<br><br>    **v.**<br><br>**WYNDHAM WORLDWIDE OPERATIONS, INC. et al.,**<br><br>       **Defendants.** | Civ. No. 2:09-1724<br><br>(KM)(SCM)<br><br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Illinois National Insurance Company ("Illinois National"), seeks a declaratory judgment that its 2008 aircraft fleet insurance policy ("2008 Policy") does not cover an August 2008 plane crash. (*See* Complaint, Count 1). Illinois National entered into the policy with Jet Aviation Business Jets, Inc. and related entities (collectively, "Jet"), an aircraft management company. The policy covered third-party clients of Jet under certain circumstances. Among those potentially covered clients were Defendants who are members of the corporate family of Wyndham Worldwide Operations, Inc. (collectively, "Wyndham"). The August 2008 plane crash involved employees of Wyndham who were flying in an airplane not owned by Wyndham; the dispute over coverage concerns that plane's status as a "non-owned" aircraft.

Alternatively, Illinois National asks that the 2008 Policy be reformed to reflect the mutual intent of Illinois National and Jet to exclude coverage with respect to third parties' "non-owned" aircraft

unless Jet was involved in the aircraft's operation. (*See* Complaint, Count 2.). Wyndham counterclaims for a declaratory judgment that the 2008 Policy does provide coverage for the crash of its non-owned plane.

This case, now on remand from the United States Court of Appeals for the Third Circuit, was reassigned to me after the retirement of Chief Judge Garrett E. Brown, Jr. The mandate of the Court of Appeals instructs the district court to analyze on remand (1) whether, in drafting the 2008 Policy, Illinois National and Jet made a mutual mistake that warrants reformation; (2) whether negligence is a bar to reformation in this case; and (3) whether reformation is barred because it was not sought until after the Accident.

Now before the court are the parties' cross-motions for summary judgment as well as Illinois National's motion to strike portions of Wyndham's L. Civ. R. 56.1 Statement and Illinois National's motion in limine to exclude the expert report of Fred. G. Marziano. For the reasons set forth below, Illinois National's motion to strike and motion in limine are denied as moot. Summary judgment is granted in favor of Illinois National on Count 2 of the Complaint. The motions are otherwise denied.

## I.   BACKGROUND

### A. Facts[1]

#### 1.   *The Aircraft Insurance Policies*

Jet Aviation International, Inc., along with its subsidiaries

---

[1]      I set forth the facts, noting those agreed upon or disputed in the parties' L. Civ. R. 56.1 Statements.

Citations to the Rule 56.1 Statements are as follows.
For Illinois National's motion (ECF No. 201, brief at ECF No. 205):
      Illinois National's Statement (ECF No. 206): "PS 201"
      Wyndham's Response (ECF No. 213-1): "DS 201"
For Wyndham's motion (ECF No. 202):
      Wyndham's Statement (ECF No. 202-2): "DS 202"
      Illinois National's Response (ECF No. 208): "PS 202"

(collectively "Jet"), provides aircraft management services to aircraft owners and operators. (PS 201 ¶1). On or about December 19, 2001, Wyndham's predecessor, Cendant Operations, Inc. ("Cendant"), entered into an Aircraft Management Services Agreement ("Agreement") with Jet. (*Id.* ¶3). Under the Agreement, Jet would manage and operate Wyndham's aircraft; the services provided by Jet were to include flight planning, crew staffing, and maintenance. (*Id.* ¶4). If Wyndham's own corporate aircraft were not available for a particular flight, Jet was to provide a substitute aircraft from its own fleet or from that of another company. (*Id.* ¶5).

The Agreement obligated Jet, as part of its service, to obtain insurance for Wyndham's aircraft. (*See id.* ¶7). Accordingly, in 2004, Jet purchased a one-year aircraft fleet insurance policy from National Union Fire Insurance Company of Pittsburgh, Pennsylvania. (*Id.* ¶17). Each year from 2005 through 2009, Jet purchased a one-year insurance policy from Illinois National. (*Id.*) Each Policy included a Managed Aircraft Endorsement ("Endorsement") that extended coverage to the aircraft of named third parties who had entered into Aircraft Management Agreements with Jet. (*Id.* ¶18). One of those named clients whose aircraft were covered under the Endorsement was Wyndham.

It is undisputed that the 2004–2008 Policies extended blanket coverage for all aircraft operated by or used at the direction of Jet. It is likewise undisputed that the 2004–08 Policies, via the Endorsement, covered all aircraft owned by Wyndham. (*Id.* ¶¶8, 18). It is also undisputed that, from 2004 through 2007, the Endorsement *excluded* from coverage "non-owned aircraft," that is, aircraft not owned by Wyndham (unless they were operated by or used at the direction of Jet, bringing them under the blanket coverage described above). (*Id.* ¶8). At issue here is whether that exclusion, effective in 2004–07, carried over to the 2008 Policy that was in effect when one of Wyndham's non-owned

aircraft crashed in August 2008.

### 2. 2008 Policy & Wording Change

In all of the relevant Policies' Endorsements, Wyndham is referred to as an "Insured Owner." The coverage issue arises from the 2008 Policy Endorsement's expanded use of another defined term, the "Named Insured." (*Id.* ¶¶18, 26, 30, 34, 38). To understand the issue, it is necessary to compare the 2004–07 policy language with the 2008 language.

From 2004 through 2006, the Policies' Declarations section listed only "Jet Aviation Holdings, Inc." as "Named Insured." In 2007 and 2008, the Declarations listed only "Jet Aviation International, Inc." as "Named Insured." (*See* Tomlinson Decl., Ex. A Pt.1 at ILNAT002576; Ex. B at ILNAT003294; Ex. D at MARSH000233; Ex. G. Pt.1 at ILNAT030564; Ex. I Pt.1 at ILNAT030884).[2]

From 2004 through 2007, the Policies' Endorsements contained the following language:

1) Jet Aviation Business Jets, Inc. has entered into an Aircraft Management Agreement with the person(s) or organization(s) described below and referred to as "Insured Owner": [list, including Wyndham][3]

2) The definition of Named Insured is extended to include the person(s) or organization(s) described in Item 1 of this endorsement. . . .

4) The insurance afforded by this policy for the interest of the "Insured Owner" described in Item 1. of this endorsement shall not

---

[2]     The Declaration of Barbara Tomlinson on July 6, 2010 is ECF No. 204-33, which is titled "Declaration Houghton Decl. Ex. CC (Tomlinson Decl.)." It was originally submitted in opposition to Wyndham's first motion for summary judgment and to dismiss before Chief Judge Brown. Exhibits A Pt.1; B; D; G Pt.1; and I Pt. 1 are ECF Nos. 204-34; 204-36; 204-38; 204-41; and 204-46.

[3]     In the 2004 Policy, Wyndham's predecessor, Cendant, was named in the Endorsement. (*Id.* ¶26).

be invalidated by any act or neglect of **Jet Aviation Business Jets, Inc.** listed in Item 1 of the policy Declarations provided that the "Insured Owner" described in Item 1. of this endorsement did not consent to such act or neglect which would otherwise invalidate the insurance provided by this policy or that the "Insured Owner" described in Item 1. of this endorsement had no knowledge that such act or neglect to which they consented would invalidate the insurance provided by this policy.

The insurance afforded by this policy for the interest of the **Jet Aviation Business Jets, Inc.** listed in Item 1 of the policy Declarations shall not be invalidated by any act or neglect of the "Insured Owner" described in Item 1. of this endorsement provided that the Named Insured listed in Item 1. of the policy Declarations did not consent to such act or neglect which would otherwise invalidate the insurance provided by this policy.

5) The insurance afforded by this policy for the interest of the "Insured Owner" described in Item 1. of this endorsement or **Jet Aviation Business Jets, Inc.** (as fully described in Item 1 of the Declarations Page) is extended to other Aircraft insured under this policy but excluding any Non-Owned Aircraft unless such Non-Owned Aircraft is operated by or used at the direction of **Jet Aviation Business Jets, Inc.** . . .

(*Id.* ¶¶26, 30, 34, 38) (emphasis added for reasons explained below).

In 2008, Jet proposed removing the reference to "Jet Aviation Business Jets, Inc." from paragraphs 4 and 5 of the Endorsement, and substituting the already-defined term, "Named Insured." (*Id.* ¶45). Illinois National agreed to the change. The language of the 2008 Endorsement was therefore revised to read as follows:

1) Jet Aviation Business Jets, Inc. has entered into an Aircraft Management Agreement with the person(s) or organization(s) described below and referred to as "Insured Owner": [list, including Wyndham]

2) The definition of Named Insured is extended to include the person(s) or organization(s) described in Item 1 of this endorsement. . . .

4) The insurance afforded by this policy for the interest of the "Insured Owner" described in Item 1. of this endorsement shall not

be invalidated by any act or neglect of the **Named Insured** listed in Item 1 of the policy Declarations provided that the "Insured Owner" described in Item 1. of this endorsement did not consent to such act or neglect which would otherwise invalidate the insurance provided by this policy or that the "Insured Owner" described in Item 1. of this endorsement had no knowledge that such act or neglect to which they consented would invalidate the insurance provided by this policy.

The insurance afforded by this policy for the interest of the **Named Insured** listed in Item 1 of the policy Declarations shall not be invalidated by any act or neglect of the "Insured Owner" described in Item 1. of this endorsement provided that the Named Insured listed in Item 1. of the policy Declarations did not consent to such act or neglect which would otherwise invalidate the insurance provided by this policy.

5) The insurance afforded by this policy for the interest of the "Insured Owner" described in Item 1. of this endorsement or the **Named Insured** (as fully described in Item 1 of the Declarations Page) is extended to other Aircraft insured under this policy but excluding any Non-Owned Aircraft unless such Non-Owned Aircraft is operated by or used at the direction of the **Named Insured**. . . .

(*Id.* ¶47 (emphasis added to show changed language)).

The "Named Insured" under the policy encompassed, not only Jet Aviation Business Jets, Inc., but also other Jet entities, because those entities, too, might be involved in arranging the use of non-owned aircraft for Insured Owners. (*Id.* ¶46). Paragraphs 4 and 5 of the 2004–07 Endorsement, because they named only Jet Aviation Business Jets, Inc., would technically have excluded coverage based on the activities of those Jet affiliated entities. It is undisputed that this was never intended by Jet; hence the 2008 amendment.

The 2008 substitution of "Named Insured," however, had a side effect not anticipated by Jet. As written, the 2008 Policy now appears to expand coverage for third parties such as Wyndham, in effect eliminating the exclusion (and mandating coverage) for Wyndham's "non-owned"

aircraft, even if those "non-owned" aircraft were not used or operated by Jet.

That apparent expansion occurs by a two-step process. As before, paragraph 2 of the Endorsement accomplishes the extension of coverage to Wyndham by including Wyndham (and all of the other Insured Owners) in the definition of "Named Insured." Recall that Paragraph 5 (2004–07 version) formerly excluded coverage of non-owned aircraft unless used or operated by Jet Aviation Business Jets, Inc. Now, however, the term "Named Insured" has been substituted for Jet Aviation Business Jets, Inc. And "Named Insured," as we have seen, is deemed by paragraph 2 to include Wyndham itself. So Wyndham's non-owned aircraft are excluded from coverage "unless such Non-Owned Aircraft are operated by or used at the direction of the Named Insured [*i.e.,* Wyndham itself]." In other words, all aircraft operated by or used at the direction of Wyndham, whether owned or non-owned, are now covered.[4]

Despite that claimed apparent expansion of coverage, Wyndham's premium fell from $61,250 for the 2007 Policy to $45,367 for 2008 Policy. (PS 201 ¶58).

From 2006 through 2009, Wyndham also continued to maintain separate insurance from StarNet Insurance Company ("StarNet") for its use of non-owned aircraft without Jet's involvement. (*Id.* ¶¶60, 62, 65, 67). It was StarNet who defended, settled, and paid the claims arising from the 2008 Accident. (*Id.* ¶¶74–75). Wyndham has been fully reimbursed by StarNet; in economic substance, this appears to be an

---

[4]    To put it another way, the 2008 policy now defines the "Named Insured" and the "Insured Owner" to include Wyndham. Substituting the name "Wyndham" for each occurrence of "the Named Insured" or "the Insured Owner" clarifies Wyndham's basis for reading the Endorsement this way:

   5)    "The insurance . . . for . . . [Wyndham] is extended to other Aircraft . . . . but excluding any Non-owned Aircraft unless . . . operated by or used at the direction of [Wyndham]."

action for contribution brought by one insurer against another.

It is undisputed that Jet, for its part, did not intend to expand coverage under the 2008 Policy to include Wyndham's use of non-owned aircraft. (*Id.* ¶51, DS 201 ¶51). And Illinois National contends that, in consenting to the 2008 amendment, it shared Jet's intent to maintain the exclusion as before. Wyndham disagrees, urging that the literal terms of the 2008 policy must govern.

### 3.   *The Accident*

In August 2008, two Wyndham employees rented a Cessna 172K aircraft to travel to a work-related meeting in Oregon. (*Id.* ¶70, DS 202 ¶3). They rented the plane from Aviation Adventures, LLC; the plane was not owned by Wyndham, and it was not operated by or used at the direction of Jet. (DS 202 ¶3, PS 201 ¶71). Minutes after take-off, on August 4, 2008, the plane crashed into a house in Gearhart, Oregon (the "Accident"), killing the two Wyndham employees and three children who were in the house. (PS 201 ¶70; DS 202 ¶¶1, 4). Three other people were injured by the crash, the house was destroyed, and a neighboring house sustained damage. (DS 202 ¶4). Following the Accident, the surviving victims, the estates of the deceased victims, family members, and owners of both houses brought lawsuits and claims against Wyndham (the "Underlying Actions"). (*Id.* ¶5).

On August 5, 2008, Wyndham gave notice of the Accident to StarNet, and on August 6, 2008, StarNet accepted its obligation to defend Wyndham against any Underlying Actions. (PS 201 ¶¶72–73). (Wyndham sought coverage from Illinois National on August 22, 2008). (*Id.* ¶¶72–73, 77). StarNet paid for all of the defense costs and for the settlement of all claims that were brought against Wyndham as a result of the Accident. (*Id.* ¶¶74, 75).

### B. Procedural history

On April 13, 2009, Illinois National filed the complaint. (ECF No. 1). Count 1 seeks a declaratory judgment that its 2008 Policy with Jet does not cover the Accident. Count 2, in the alternative, seeks equitable reformation of the 2008 Policy, based on mutual mistake. Wyndham filed a counterclaim seeking declaratory judgment that the Policy does cover the Accident. (ECF No. 16).

On August 23, 2010, Chief Judge Garrett E. Brown, Jr., granted Wyndham's motion (ECF No. 60) to dismiss Illinois National's complaint and motion for summary judgment on its counterclaim. *Illinois Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, No. CIV.A. 09-1724 GEB-D, 2010 WL 3326709 (D.N.J. Aug. 23, 2010). Judge Brown reasoned that (1) the plain language of the 2008 Policy provided Wyndham with coverage for the accident; (2) reformation was inappropriate "because Wyndham did not participate in the negotiation and drafting of the 2008 policy, [and therefore] there can be no mutual mistake." *Id.* at *5.[5]

On August 3, 2011 the Third Circuit reversed Judge Brown's decision. *See Illinois National Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225 (3d Cir. 2011). The majority opinion of the Court of Appeals held that the complaint pled facts sufficient to make out a claim for reformation of the policy based on mutual mistake. The relevant parties for purposes of mutual mistake, the Court of Appeals held, were the contracting parties, Illinois National and Jet. The district court had erred in holding that mutual mistake could not be asserted against a non-contracting party—in this case, Wyndham. *See id.* at 232.

In the interim, Chief Judge Brown, to whom the case had been assigned, retired. On remand, in November 2011, the case was originally

---

[5]    Judge Brown also held that the proofs did not surmount the threshold for reformation based on unilateral mistake by Illinois National. *Id.*

reassigned to District Judge Cecchi. In August 2012, it was again reassigned, this time to me.

On September 11, 2013, the parties filed cross-motions for summary judgment. Illinois National also moved to strike portions of Wyndham's L. CIV. R. 56.1 Statement. (ECF No. 211).

## II.    ILLINOIS NATIONAL'S MOTION TO STRIKE

Illinois National moves to strike portions of Wyndham's Rule 56.1 Statement (ECF No. 202-2), arguing that many paragraphs impermissibly include legal argument and conclusory factual statements.[6] In this District, each party to a summary judgment motion must submit a statement of material facts that are not in dispute. L. CIV. R. 56.1. Such a statement may not "contain legal argument or conclusions of law." *Id.* Statements that "blur[] the line between fact and opinion" and include "arguments cloaked as 'undisputed facts'" are improper under the Rule and will not be considered by the court. *N.J. Auto. Ins. Plan v. Sciarra,* 103 F. Supp. 2d 388, 395 n.4 (D.N.J. 1998).

Of course, the affidavits and evidence are most central to the identification of any genuine issue of material fact; the Rule 56.1 statement is just a useful distillation of what is contained therein. So rather than painstakingly parse the Rule 56.1 statement, I will sort out the permissibility of particular items if and as necessary to my analysis. I am empowered to disregard those portions of a Rule 56.1 statement that violate the rule. L. Civ. R. 7.2(a) ("Legal arguments and summations in [affidavits, declarations, certifications, and other documents referenced in 28 U.S.C. §1746] will be disregarded by the Court."); *see, e.g., Eckhaus,* 2003 WL 23205042, at *6 ("*sua sponte* disregard[ing] the legal

---

[6]     Specifically, Illinois National seeks to strike paragraphs 6, 8, 15, 20, 22, 24, 29–32, 39, 46–48, 51–53, 56, 61–65, 75–79, 83–84, 86, 90–97, 99–102, 104, 109–115, 117–119, and 121–132.

arguments and conclusions in Plaintiff's Local Civil Rule 56.1 Statement"
and denying the defendant's motion to strike as moot). Illinois National's
motion to strike is therefore denied as moot.

## III.   CROSS-MOTIONS FOR SUMMARY JUDGMENT[7]

The parties have filed cross-motions for summary judgment. Their
arguments focus on the Third Circuit's mandate, which requires this
Court to consider on remand (1) whether Illinois National and Jet made a
mutual mistake in drafting the 2008 Policy that warrants reformation; (2)
whether negligence is a bar to reformation in this case; and (3) whether
reformation is barred because it was not sought until after the Accident.[8]

### A. Summary judgment standard

A court "shall grant summary judgment if the movant shows that
there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also
Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daniels v. Sch.
Dist. Of Phila.*, No. 14-1503, 2015 WL 252428, at *6 (3d Cir. Jan. 20,
2015). In deciding a motion for summary judgment, a court must

---

[7]   Citations to the parties' moving papers are as follows.
For Illinois National's motion (ECF No. 201, brief at ECF No. 205):
  Illinois National's Motion (ECF No. 205): "Pl. 201 Mot."
  Wyndham's Opposition (ECF No. 213): "Def. 201 Opp."
  Illinois National's Reply (ECF No. 216): "Pl. 201 Reply"
For Wyndham's motion (ECF No. 202):
  Wyndham's Motion (ECF No. 202): "Def. 202 Mot."
  Illinois National's Opposition (ECF No. 209): "Pl. 202 Opp."
  Wyndham's Reply (ECF No. 217): "Def. 202 Reply"

[8]   Illinois National continues to maintain that the 2008 Policy, even as
written, does not cover Wyndham's use of non-owned aircraft operated without
Jet's involvement. I agree with Judge Brown and the Third Circuit that the 2008
Policy, as written, does appear to cover the Accident. *See Illinois Nat'l Ins. Co.*,
2010 WL 3326709 at *6 (concluding that "the policy is clear on its face" that it
provides coverage for the Accident); *Illinois National Ins. Co.*, 653 F.3d at 229
("[T]he modification, as written, appears to provide third parties with coverage
when using non-owned aircraft without Jet Aviation's involvement."). That
assumption is the foundation of the mandate, and of my further analysis.

construe all facts and inferences in the light most favorable to the nonmoving party. *Heffernan v. City of Paterson,* No. 14-1610, 2015 WL 265514, at *2 (3d Cir. Jan. 22, 2015). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The existence, or not, of a genuine, material issue must be considered in light of the ultimate burden of proof—here, proof by clear and convincing evidence. *See* p. 14, *infra; Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 244 (1986) (the "clear and convincing" standard must be considered on a motion for summary judgment).

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson,* 477 U.S. at 248; *see also* Fed R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation,* 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

When, as here, the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.,* 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.,* 19 F. Supp. 2d 254 (D.N.J. 1998)). The court must consider the motions independently, in accordance with the

principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

This Court has subject matter jurisdiction because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. The parties appear to be in agreement that the substantive issues are governed by the law of the state of New Jersey.

### B. Reformation Based on Mutual Mistake

#### 1. *General standards*

"Generally, when interpreting an insurance policy, courts should give the policy's words their plain, ordinary meaning." *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929, 933 (N.J. 2005) (internal citations and quotations omitted). That said, the primary goal of contract interpretation is always to "enforce contracts as the parties intended." *Pacifico v. Pacifico*, 920 A.2d 73, 77 (N.J. 2007).

To effectuate the contracting parties' intent, a court may "reform the terms of a written instrument on a claim of mutual mistake, without regard to whether the writing is in fact ambiguous." *Cent. State Bank v. Hudik-Ross Co., Inc.*, 396 A.2d 347, 350 (N.J. Super. Ct. App. Div. 1978). "That contracts where there is a mutual mistake common to both parties may be reformed in equity is [] well settled in [New Jersey] jurisprudence." *Sav. Inv. & Trust Co. v. Conn. Mut. Life Ins. Co.*, 85 A.2d

311, 314 (N.J. Super. Ct. Ch. Div. 1951). Indeed, "[t]he power of a court of equity to reform deeds and other writings for the correction of mistakes stands among its most ancient and useful powers." *Cummings v. Bulgin*, 37 N.J. Eq. 476, 477 (N.J. Ch. 1883).

Reformation is possible even in the absence of an original party to the contract. "[A] party to the mistake need not be joined unless he has a subsisting interest that will be affected." *Allen B. Du Mont Lab, Inc. v. Marcalus Mfg. Co.*, 152 A.2d 841, 846 (N.J. 1959) ("The argument is that the mental operations of a party to the basic transaction cannot be explored and determined unless he is in court. We do not understand why this should be so."). Referring specifically to Illinois National's claim against Wyndham, the Third Circuit held that "[r]eformation on the basis of mutual mistake can be granted even when it is to the disadvantage of a third party." *Illinois National*, 653 F.3d at 232.

Mutual mistake exists when the parties have "met and reached a prior existing agreement, which the written document fails to express." *Bonnco Petrol, Inc. v. Epstein*, 560 A.2d 655, 660 (N.J. 1989). As the name implies, the mistake must be mutual; reformation is warranted only when "*both* parties were laboring under the *same* apprehension as to [a] particular, essential fact" and when the mistake has a material effect on the agreed-upon exchange. *Id.* at 659 (emphasis in original; citing *Beachcomber Coins, Inc. v. Boskett*, 400 A.2d 78, 80 (N.J. Super. Ct. App. Div. 1979); Restatement (Second) of Contracts § 152(1) (1981)). Thus, "[f]or a court to grant reformation there must be clear and convincing proof that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be." *Cent. State Bank*, 396 A.2d at 351 (internal citations and quotation marks omitted); *see also Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 988 F.2d 386, 404 (3d Cir. 1993) ("Reformation is available when clear and convincing evidence shows. . . their mutual mistake

14

resulted in a written document which does not accurately reflect the terms of the parties' agreement." (citing Restatement (Second) of Contracts § 155 (1981)).

Extrinsic evidence is admissible to show mutual mistake. *See Conforti v. Guliadis*, 608 A.2d 225, 230 (N.J 1992) ("In evaluating claims of mutual mistake and fraud, a court necessarily must look beyond the four corners of the contract."); *Park Hamilton Condo. Ass'n, Inc. v. Park Hamilton, L.P.*, No. A-2926-05T3, 2007 WL 162292, at *4 (N.J. Super. Ct. App. Div. Jan. 24, 2007) (quoting *Conforti*); *Cent. State Bank*, 396 A.2d at 350 ("[P]arol and extrinsic evidence is admissible in a suit to reform the terms of a written instrument on a claim of mutual mistake, without regard to whether the writing is in fact ambiguous."). It would be difficult to determine whether the contract as written fails to express the parties' intent if analysis were confined to the four corners of the contract itself.

Applying those principles to this case, to justify a reformation of the policy based on mutual mistake, Illinois National must demonstrate that (1) when the revised 2008 policy was negotiated, Jet did not intend to grant Wyndham coverage of non-owned aircraft that were not operated by or used at the direction of Jet; (2) Illinois National contemporaneously shared that intent; and (3) the 2008 Policy as drafted does not reflect that shared intent.

### 2.      The shared intent of Jet and Illinois National

I consider the first two elements together. It is undisputed that Jet did not intend to provide Wyndham with coverage for non-owned aircraft not operated by or used at the direction of Jet. (DS 201 ¶51). I therefore focus on the issue of whether Illinois National, when the 2008 Policy was negotiated, shared Jet's intent. I construe the evidence in favor of Wyndham, mindful of the clear and convincing standard of proof. Applying the Rule 56 standard, I conclude that Illinois National, like Jet,

intended that the 2008 Policy would not cover Wyndham's use of non-owned aircraft unless Jet operated them or directed their use.

In support of summary judgment, Illinois National points to eight evidentiary factors: (a) statements of the contracting parties' representatives; (b) prior policies; (c) Wyndham's reasonable expectations/course of dealing; (d) Wyndham and Jet's agreement; (e) decrease in the premium paid; (f) confirmations of coverage; (g) Wyndham's position; and (h) absurdity of Wyndham's reading of the contract. I discuss them in turn.

*(a) Statements of Contracting Parties' Representatives as to the Purpose of the 2008 Language Change.* Illinois National points to the declarations of Illinois National's lead underwriter for the 2008 Policy, Barbara Tomlinson, and Jet's contracting representative, Gary Konicki, as well as the deposition testimony of Jet's broker representatives, Alan Winters and Zoe Holmes of Marsh USA, Inc. (Pl. 201 Mot. 30). All support Illinois National's position. All of the contracting parties' representatives state that the purpose of substituting "Named Insured" in place of "Jet Aviation Business Jets, Inc." was to capture all of Jet's affiliates.[9] (*Id.* (citing PS 201 ¶¶50, 51, 52)); Tomlinson Decl. ¶¶37, 39 (ECF No. 204-33); Konicki Decl. ¶¶21, 22, 24 (ECF No. 204-30); Winters Dep. 68:6-69:13; 75:19-77:7; 80:11-83:1 (ECF No. 204-16); Holmes Dep. 62:12-63:21 (ECF No. 204-17)); *see also* Def. 202 Mot. 38–39 (citing deposition

---

[9]     As Wyndham points out, Barbara Tomlinson does write in one email that the change allowed Illinois National to avoid having to replace "Jet Aviation Business Jets, Inc." with the names of other management companies for Illinois National's other contracts. (DS 201 ¶46 (citing Lichtenstein Decl. Ex. 52 at ILNAT32003, ECF No. 203-2)). Still, in her Declaration, Tomlinson confirms her understanding of why Jet proposed the change. That she also intended the change to simplify Illinois National's drafting for other policies for other management companies is not contradictory. The crucial point is that all contracting party representatives agree that it was *no one's* intent to expand coverage for Wyndham's (or other Insured Owners') use of non-owned aircraft operated without Jet's involvement.

testimony)).[10] All of the contracting parties' representatives state that they did not intend to expand coverage to include non-owned aircraft operated without Jet's involvement. (*Id.*).

Wyndham asserts that, because Illinois National and Jet refuse to admit that they made a "mistake" in drafting, there can be no award of summary judgment on the reformation claim.[11] (Def. 202 Reply 6, n.5; Def. 202 Mot. 38–39). Count 1 asserts that the 2008 Policy, as written, does not cover this Accident; Count 2 asserts that, if the Policy does cover the Accident, it should be reformed, because that was not the parties' intent. There is nothing wrong with that; a party may plead in the alternative and prevail on one of its two theories. *See* Fed. R. Civ. P. 8(d)(2). More fundamentally, mutual mistake is a doctrine of contract law, not a sacrament of confession. Its purpose is not to force parties to admit fault. Illinois National's burden here is to prove that its intent was the same as that of Jet. *See Cent. State Bank*, 396 A.2d at 351 (internal citations and quotation marks omitted) ("[T]here must be clear and

---

[10]    The Declaration of Barbara Tomlinson on July 6, 2010 is ECF No. 204-33, which is titled "Declaration Houghton Decl. Ex. CC (Tomlinson Decl.)." It was originally submitted in opposition to Wyndham's first motion for summary judgment and to dismiss before Chief Judge Brown.

The Declaration of Gary Konicki on July 6, 2010 is ECF No. 204-30, which is titled "Declaration Houghton Dec. Ex. BB (Konicki Decl.)." It was originally submitted in opposition to Wyndham's first motion for summary judgment and to dismiss before Chief Judge Brown.

The transcript from the deposition of Alan D. Winters is ECF No. 204-16, which is titled "Exhibit Houghton Decl. Ex. P."

The transcript from the deposition of Zoe Holmes is ECF No. 204-17, which is titled "Exhibit Houghton Decl. Ex. Q."

[11]    Wyndham is referring to Illinois National's alternative argument that the Policy, even without reformation, does not extend coverage to the 2008 Accident. *See* Complaint Count 1; n.8, *supra*. I am reluctant to accept what amounts to an opportunistic argument. Obviously Wyndham does not truly seek to persuade the court that Illinois National's reading of the Policy is correct. Wyndham's entire case is predicated on the contention that the 2008 Policy *did* expand coverage to include its non-owned aircraft. Any accusation of inconsistency applies equally to itself.

convincing proof that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be."). Having shown that shared intent, it may obtain reformation if the writing as executed failed to reflect that intent. Whether the contract actually effectuated that intent, or inadvertently failed to do so, the parties' intent was the same. The statement of the contracting parties' representatives that they thought the contract *did* reflect that intent only confirms that the parties' intent was to clarify a reference in the 2008 Policy without substantively changing the coverage.

*(b) Prior Policies.* Illinois National argues that its prior policies with Jet, the provisions of which remained substantially the same through 2007, are relevant to intent. (Pl. 201 Mot. 30–31 (citing PS 201 ¶¶30, 34, 38)). Indeed, a before-and-after comparison is essential to an understanding of the 2008 revision. Combined with the statements of the Illinois National and Jet representatives that no substantive change in coverage was intended, this evidence favors of a finding of mutual mistake.[12]

*(c) Wyndham's Reasonable Expectations/Course of Dealing.* Illinois National argues that the course of dealing between Wyndham and Jet weighs in favor of finding mutual mistake. Wyndham accepted the same coverage year after year without complaint, never seeking to expand it. (*Id.* 32). In 2006–07, in 2008, and in 2009, Wyndham purchased coverage from StarNet that would have been superfluous if its view of the Illinois National policy were correct. (*Id.* 32–33). That course of dealing does not prove, but tends to confirm, that the 2008 "expansion" was an unintended one. To be sure, however, this evidence of the understanding

---

[12]   According to Wyndham, any evidence that "predates the Wording Change" is not appropriate for this Court to consider. (Def. 201 Opp. 17). It cites no case law in support of that proposition. As explained above, extrinsic evidence is not just permissible but essential when considering whether a contract's language fails to reflect the parties' intent.

between Wyndham and Jet is secondary to the central issue of the intent shared by Illinois National and Jet.[13]

(d) *Wyndham and Jet's Agreement.* Wyndham and Jet's Agreement does not require Jet to procure coverage for non-owned aircraft operated without Jet's involvement. (Pl. 201 Mot. 33–34). This evidence tends to confirm that Jet had no reason to, and therefore did not, obtain such coverage from Illinois National in 2008. Again, this evidence provides context for, but is not central to, the shared understanding of Illinois National and Jet.

(e) *Decrease in Premium Paid.* Wyndham's premium payments steadily decreased, from $73,399 for the 2006 Policy to $61,250 for the 2007 Policy, and then to $45,367 for the 2008 Policy. (PS 201 ¶58). That downward progression, says Illinois National, is inconsistent with any intent to increase coverage in the 2008 Policy. (Pl. 201 Mot. 34–35 (citing PS 201 ¶58)). Such evidence is suggestive, though not conclusive. Many factors may go into a premium decrease, and competitive pressures may impel an insurer to increase coverage. Wyndham points out that the 2008 policy expanded coverage to include contingent liability and increased certain liability limits by $200 million. (*Id.* 20 (citing DS 202 ¶64); Def. 201 Opp. 19–20). Still, this evidence is at worst neutral; in no way does it suggest that Illinois National and Jet suddenly decided to take on additional liability for non-owned aircraft with which Jet had no connection.

(f) *Confirmations of Coverage.* Illinois National issued Confirmations

---

[13]   Illinois National points out that Wyndham's broker confirmed to Wyndham that the 2008 Policy would exclude coverage for non-owned aircraft used without Jet's involvement. (*Id.* 35 (citing PS 201 ¶56)). Wyndham replies this evidence is not especially persuasive. (*See, e.g.*, DS 201 ¶¶41, 53). First, the broker's confirmation was based on an analysis of the pre-2008 Policy. (DS 201 ¶56). Second, it is not Wyndham and Jet's course of dealing, but Illinois National and Jet's course of dealing, that is relevant to mutual mistake.

of Coverage to Wyndham each year from 2004 through 2008. (Pl. 201 Mot. 35 (citing PS 201 ¶¶29, 33, 37, 43)). These were identical. Each one, including the 2008 Confirmation, limited "non-Owned Liability . . . to aircraft used at or by the direct of Jet Aviation Business Jets, Inc." (PS 201 ¶¶29, 33, 37, 43). As Wyndham points out, the 2008 Confirmation's significance is lessened by the fact that it predated the wording change in the 2008 Policy. (DS 201 ¶43). The Confirmation nevertheless constitutes at least general evidence of Illinois National's intentions with respect to the 2008 Policy, and supports an inference of mistake.

*(g) Wyndham's Position.* Illinois National points out that "as late as the eve of this action, Wyndham said it had 'no position' as to coverage under the 2008 Policy." (Pl. 201 Mot. 35 (citing PS 201 ¶78)). Wyndham disputes Illinois National's citations and asserts that it had requested coverage as early as August 2008. (DS 201 ¶78). Issue is joined, and Illinois National does not argue that Wyndham has waived its right to argue for coverage under the 2008 Policy. I do not find this evidence to be very persuasive either way.

*(h) Absurdity of Wyndham's Reading of the Policy.* Wyndham's reading of the 2008 Policy Endorsement, as applied to itself, in effect requires that the reader substitute the name "Wyndham" for each occurrence of "Named Insured" or "Insured Owner." (Pl. 201 Mot. 23–24). Such a reading, says Illinois National, creates absurdities, bolstering the inference that it was not intended. The exclusion in the Endorsement, for example, would read: "The insurance . . . for . . . [Wyndham] is extended to other Aircraft . . . but excluding any Non-owned Aircraft unless . . . operated by or used at the direction of [Wyndham]." (Pl. 201 Br. 22–23 (citing paragraph 5 of 2008 Endorsement; *see* p.5–6, *supra*, for full text)). *Any* of Wyndham's relevant non-owned aircraft will necessarily be "operated by or used at the direction of [Wyndham]." (*Id.* 23). Wyndham's expert agreed that this

"exclusion" is therefore no exclusion at all. (*Id.* (citing Houghton Decl. Ex. V (ECF No. 204-22), Marziano Dep. 111:15–21)). If the intent were to include all non-owned aircraft and exclude none, this would be a very roundabout way of accomplishing that. While not necessarily "absurd," this reading suggests that Illinois National never intended to expand coverage in the manner that is suggested.

For all of these reasons, I conclude that the evidence one-sidedly supports Illinois National's position that it shared Jet's intent to maintain the existing scope of coverage when it negotiated the 2008 Policy.

An illustrative case is *Park Hamilton Condo. Ass'n, Inc. v. Park Hamilton, L.P., supra,* in which the Appellate Division of the Superior Court of New Jersey affirmed the trial court's reformation of a master deed. There, the plaintiff, a condominium association, sued for a declaratory judgment that it owned a parking lot in the condo complex. 2007 WL 162292. at *1. A master deed had conveyed certain commercial premises from plaintiff to defendant's predecessor, but the deed did not refer to the parking lot. The evidence showed that, since the conveyance, the defendant and its predecessors had nevertheless operated the parking lot without objection, and that the plaintiff had previously acknowledged the defendant's ownership of the parking lot. *Id.* The Appellate Division upheld the trial court's determination that the contracting parties, at the time of the conveyance, had shared an intent to convey the parking lot, and that its omission from the deed was the result of a mutual mistake. *Id.* at *4.

The *Park Hamilton* defendant faced a barrier not present in this case. There, the plaintiff was one of the contracting parties; to prove mutual mistake, the defendant had to overcome the plaintiff's description of its own intent. Here, by contrast, *both* contracting parties, Illinois National and Jet, agree that it was never their intent to insure

Wyndham's use of non-owned aircraft operated without Jet's involvement. Their positions (unlike that of the condo association in *Park Hamilton*) have not changed since they signed the 2008 Policy. Statements from their representatives, along with other evidence, confirm that shared intent. Wyndham, in some sense an interloper, seeks to tell the parties that their intent was something else. Supporting evidence, let alone clear and convincing evidence, is lacking.

Even accepting all of Wyndham's factual statements as true, Illinois National has produced clear and convincing evidence that it did not intend for the 2008 Policy to cover Wyndham's use of non-owned aircraft without Jet's involvement. Wyndham contends with some force that one piece or another of Illinois National's evidence lacks persuasive weight. But Wyndham does not dispute the authenticity of Illinois National's central evidence or offer evidence to the contrary sufficient to create a triable issue. Based on that lack of a genuine issue, I conclude that, when Illinois National and Jet entered into the 2008 Policy, they intended to maintain the existing exclusion of coverage of non-owned aircraft unless operated by or used at the direction of Jet. Subject to two other issues raised by Wyndham, discussed in Sections III.C and D, *infra*, I find that reformation of the 2008 Policy to reflect the intent of the parties is appropriate.

### C.   Negligence as a Potential Bar to Reformation

Wyndham argues that Illinois National was grossly negligent, and that its negligence bars reformation. (Def. 202 Mot. 22–35; Def. 201 Opp. 21–33). Some New Jersey cases have found, under particular circumstances, that the negligence of the party seeking reformation may bar that remedy. Those holdings do not apply where, as here, both contracting parties acknowledge that their intent differed from the written contract, and there is no showing of cognizable prejudice. More generally, as to equitable reformation "the guiding principle is fairness,"

and I see no strong reasons of fairness to bar an otherwise proper reformation. *Wallace v. Summerhill Nursing Home*, 883 A.2d 384, 386 (N.J. Super. Ct. App. Div. 2005).

Mere negligence is not a bar to reformation based on mutual mistake. *See Beachcomber Coins, Inc. v. Boskett*, 400 A.2d 78, 79 (N.J. Super. Ct. App. Div. 1979) (citing Restatement Contracts, §502 at 977 (1932)) ("negligent failure of a party to know or to discover the facts as to which both parties are under a mistake does not preclude rescission or reformation on account thereof."); *Wallace v. Summerhill Nursing Home*, 883 A.2d 384, 386 (N.J. Super. Ct. App. Div. 2005) (citing *Beachcomber*); *Crane v. Bielski*, 104 A.2d 651, 655 (N.J. 1954) ("'Mistake,' by its very definition, implies some degree of negligence.") Of course, the touchstone of equity is always fairness: "it still remains the obligation of a court of equity to determine whether, despite such misjudgment, it would be inequitable and fundamentally unjust not to set aside the sale." *Id.*; *Hamel v. Allstate Ins. Co.*, 559 A.2d 455, 458 (N.J. Super. Ct. App. Div. 1989).

In particular, negligence will not bar reformation where there is no resulting prejudice or harm. As New Jersey's former Court of Chancery long ago held:

> [E]ven a clearly established negligence may not of itself be a sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby. . . . Where . . . no one is injured by the mistake but the party himself, and no one has changed his position by reason of the act executed through the influence of the alleged mistake, I see no reason why the mistake should not be corrected although the highest degree of vigilance has not been exercised.

*Inst. Bldg. & Loan Ass'n v. Edwards*, 86 A. 962, 964–65 (N.J. Ch. 1913); *see also Home Owners' Loan Corp. v. Collins,* 184 A. 621, 623 (N.J. Ch. 1936) (citing *Inst. Bldg. & Loan Ass'n*); *Fleisher v. Colon*, No. A-2807-10T1, 2012 WL 360282, at *6 (N.J. Super. Ct. App. Div. Feb. 6, 2012)

(citing *Inst. Bldg. & Loan Ass'n*); *Villanueva v. Amica Mut. Ins. Co.*, 864
A.2d 428, 432 (N.J. Super. App. Div. 2005) (even rescission for a
unilateral mistake is not barred by the mistaken party's negligence where
there is no "legal prejudice as a result of that mistake."); *Smith v.
Fireworks By Girone, Inc.*, 881 A.2d 1243, 1254 (N.J. Super. Ct. App. Div.
2005) (rescission of insurance settlement appropriate even for a
unilateral mistake "in the absence of prejudice").

Indeed, where there is no prejudice or harm to the other party,
even gross negligence is not an absolute bar to reformation in equity. As
New Jersey's former Court of Chancery long ago explained:

> A rule that denied relief to a complainant who has been
> guilty of any negligence would not be without a logical basis;
> but, as we have seen, such a rule is not the law in this state
> (nor is it the law generally). That being so, why should even
> gross negligence by complainant, without more, be a bar to
> relief? What logical basis can there be for attempting to
> differentiate the rule as between cases of negligence and
> cases of gross negligence. If relief is to be denied on the
> theory of complainant's not being entitled to relief when he
> has been guilty of negligence, then any negligence should
> bar. If such is not the theory, then why should even gross
> negligence bar? And how and where can such a line be
> drawn? . . . Obviously if defendant (being without fault) has
> changed his position as the result of complainant's
> negligence, that would be ground for raising some estoppel;
> but that would be true whether the negligence was gross or
> slight, and indeed it would seem that it would also be true
> even if there had been nothing negligent on the part of
> complainant.

*Cliffside Park Title & Guarantee & Trust Co. v. Progressive Theatres*, 192
A. 520, 525 (N.J. Ch. 1937); *cf., Investors Sav. Bank v. Keybank Nat.
Ass'n*, 38 A.3d 638, 643 (N.J. Super. Ct. App. Div. 2012) (citing *Cliffside*
and holding that, as to equitable subrogation of a mortgage, the
distinction between regular and gross negligence does not matter absent
a showing of prejudice).

Jet and Illinois National, who agree that there was a mistake, will not be prejudiced by judicial recognition of that mistake. Moreover, it is undisputed that Wyndham, a non-contracting party, did not suffer any prejudice from the mistake, and will not be harmed by reformation. (*See* PS 201 and DS 201 ¶¶74–76, 79–80). Reformation will result in the 2008 coverage's remaining precisely as it had been for the four preceding years. Wyndham did not negotiate or pay for expanded coverage in 2008. Wyndham paid a lower premium in 2008 than it had paid in 2007. For all that appears in the record, Wyndham, like Jet and Illinois National, did not anticipate any expansion of coverage. And it is telling that in 2008 Wyndham continued as before to maintain and pay for insurance from StarNet to cover non-owned aircraft.[14] There is no evidence that Wyndham's negotiations with StarNet contemplated shared coverage of non-owned aircraft. In short, Wyndham did not change its position or incur any detriment as a result of the 2008 wording change. No concerns of fairness stand in the way of reformation.

Wyndham cites several cases in support of its argument that "negligence of an inexcusable nature will preclude reformation, even when there is a mutual mistake." (Def. 201 Opp. 22). I do not find them to be applicable or persuasive.

In *Savings Investment & Trust Co. v. Conn. Mut. Life Ins. Co.*, 85 A.2d 311 (N.J. Super. Ct. Ch. Div. 1951), for example, the court *granted* reformation of a contract based on mutual mistake. Because of a "ministerial or clerical error," the date on the agreement was not the date that the parties intended. *Id.* at 314–15. The case does not support denial of reformation based on "negligence" here. In other New Jersey

---

[14]     That coverage would have been redundant if the Illinois National policy covered non-owned aircraft. Indeed, it appears that redundancy is precisely the outcome sought. StarNet paid the cost of defense and funded the settlement to Wyndham. (PS 201 ¶¶73–76). The question now is whether Illinois National must contribute.

cases cited by Wyndham (Def. 201 Opp. 22), an insured was denied reformation based on the insurer's objection that the insured failed to discharge its duty to examine the policy to ascertain the scope of coverage. *See Bilotti v. USAA Cas. Ins. Grp.*, No. A-3159-06T2, 2007 WL 4119220, at *4 (N.J. Super. Ct. App. Div. Nov. 21, 2007) ("Reformation will not be granted on the grounds of mistake resulting from the *complaining party's* own negligence." (emphasis added) (internal citation and quotation omitted)); *Martinez v. John Hancock Mut. Life Ins. Co.*, 367 A.2d 904, 910 (N.J. Super. Ct. App. Div. 1976) (noting that mutual mistake was not present in the case, as the problem was insured's unilateral mistake in not reading the policy); *Botti v. CNA Ins. Co.*, 824 A.2d 1120, 1124 (N.J. Super. Ct. App. Div. 2003) ("[R]eformation will be denied if [an insured] has been negligent in failing to apprise himself of its contents." (internal citation and quotation omitted))); Def. 202 Mot. 24–25 (citing *Pierides v. GEICO Ins. Co.*, No. A-2783-08T1, 2010 WL 1526377 (N.J. Super. Ct. App. Div. Apr. 19, 2010) (noting that "this is not a case of mutual mistake"); *Berkowitz v. Westchester Fire Ins. Co.*, 150 A. 404 (N.J. 1930) (involving an insured's failure to read a policy, rather than mutual mistake))).

Those cases do not persuade me to deny reformation here. Most importantly, in each, the insured was negligent in discharging its duty to read the insurance policy. As a result, the insured failed to discover that the policy did not grant all of the coverage the insured desired. These were treated as cases of unilateral, not mutual, mistake; there was no contention that the insurer, too, intended a higher level of coverage. Here, by contrast, the mutual intent of the insured and the insurer failed to achieve expression in the Policy. In short, the equities are very different here.[15]

---

[15]    Wyndham's citations to cases from Oregon, Ohio, Georgia, West Virginia, and the Federal Circuit are neither binding on this Court nor persuasive. (*See*

The "negligence" case law does not read onto this case. Here, neither party to the negotiation, however negligent, is opposing reformation. Neither is trying to shift unwanted consequences of its own neglect to the other. Illinois National and Jet agree that their true intent was not reflected in the contract language. If one party was negligent in not discovering this, then so was the other. Under such circumstances, equity does not demand that I withhold the remedy of reformation.

### D. Post-Accident Reformation

Wyndham argues that post-occurrence reformation is inequitable where an insurer purposefully uses certain language in a policy that "creates a clear and unambiguous right to coverage." (Def. 202 Reply 10–11). Certainly the bar on post-accident reformation is not absolute; New Jersey courts have granted it repeatedly. *See, e.g., Stamen v. Metro. Life Ins. Co.*, 124 A.2d 328 (N.J. Super. Ct. App. Div. 1956) (reforming disability benefits provision of life insurance policy post-plaintiff's disability onset due to mutual mistake and/or unilateral mistake of insurer and inequitable conduct of insured); *Sav. Investment & Trust Co. v. Conn. Mut. Life Ins. Co.*, 85 A.2d 311 (N.J. Super. Ct. Ch. Div. 1951) (reformation based on mutual mistake of life insurance policy after the death of the insured); *Parrette v. Citizens' Cas. Co.*, 15 A.2d 802, (N.J. 1940) (reformation based on mutual mistake of a car insurance policy

---

Def. 201 Opp. 22; Def. 202 Mot. 24–26). As in the New Jersey cases cited above, these courts either did not find mutual mistake to exist, or found that unilateral negligence by one party precluded reformation that would have shifted the consequences to the other, non-negligent party. *See Foster v. Gibbons*, 33 P.3d 329, 335 (Or. Ct. App. 2001); *Murray v. Laugsand*, 39 P.3d 241, 251 (Or. Ct. App. 2002); *Carr Chevrolet, Inc. v. Am. Hardware Mut. Ins. Co.*, No. CIV. 01-1508-FR, 2003 WL 23590746, at *7–8 (D. Or. May 19, 2003); *Wells Fargo v. Mowery*, 931 N.E.2d 1121, 1130 (Ohio Ct. App. 2010); *Motorists Mut. Ins. Co. v. Columbus Fin., Inc.*, 861 N.E.2d 605, 609–611 (Ohio Ct. App. 2006); *B. L. Ivey Const. Co. v. Pilot Fire & Cas. Co.*, 295 F. Supp. 840, 845 (N.D. Ga. 1968); *Royal Ins. Co. v. City of Morgantown, W.Va.*, 98 F. Supp. 609, 611 (N.D.W. Va. 1951); *Giesler v. United States*, 232 F.3d 864 (Fed. Cir. 2000).

after an accident); *Biliunas v. Balassaitis*, 171 A. 319 (N.J. Super. Ct. Ch. Div. 1934) (reformation based on mutual mistake of a fire insurance policy after a fire).[16]

Some New Jersey courts have barred post-occurrence reformation to insureds who failed to read their policies, a different matter. Wyndham urges that this Court transform these holdings into a general bar, applicable to all careless policy drafters. (Def. 201 Opp. 34; Def. 202 Mot. 35–37). The cases cited, however, do not involve mutual mistake, and their facts are distinguishable. (*See* Def. 201 Opp. 35 (citing *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1265 (2001) (considering the doctrine of reasonable expectations of the insured, with no mention of reformation at all); Def. 202 Mot. 35–27 (citing *Martinez v. John Hancock Mut. Life Ins. Co.*, 367 A.2d 904 (N.J. Super. Ct. App. Div. 1976) (considering fraud and equitable estoppel rather than mutual mistake); *Pierides v. GEICO Ins. Co.*, No. A-2783-08T1, 2010 WL 1526377 (N.J. Super. Ct. App. Div. Apr. 19, 2010) (considering the insurer's potential breach of obligation to advise the insured of the policy provisions and noting that "this is not a case of mutual mistake"); *Berkowitz v. Westchester Fire Ins. Co.*, 150 A. 404 (N.J. 1930) (involving an insured's failure to read a policy, rather than mutual mistake)); Def. 202 Reply 12 (citing *Sparks v. St. Paul Ins. Co.*, 495 A.2d 406 (N.J. 1985) (considering the doctrine of reasonable expectations of the insured, with no mention of mutual mistake))).

No more convincing is Wyndham's invocation of "well-established

---

16    Wyndham relies on a case from the Court of Appeals of Washington, *Mission Ins. Co. v. Guarantee Ins. Co.*, for the proposition that "post-occurrence reformation is not available when an insurer fails to recognize that language it *purposefully* uses creates a[] clear and unambiguous right to insurance coverage." (Def. 201 Opp. 33–34 (citing 683 P.2d 215, 218 (Wash. Ct. App. 1984))). However, *Mission* involved a statutorily mandated omnibus clause, and it was this clause that the Court ruled could not simply be modified by the insurance carrier and the insured post-occurrence where there was no evidence of a prior agreement to waive it. *See id.* at 218–19.

rules regarding insurers' responsibilities' when drafting policies." (Def. 202 Mot. 37). Again, the cases cited do not involve mutual mistake at all. (*See* Def. 202 Mot. 37 (citing *State Farm Mut. Auto. Ins. Co. v. Am. Cas. Co.*, 433 F.2d 1007 (8th Cir. 1970) (involving general considerations of equity rather than mutual mistake); *Meier v. New Jersey Life Ins. Co.*, 503 A.2d 862 (N.J. 1986) (finding that there was no mutual assent to the termination of an insurance policy))). In any event, both Illinois National and Jet are sophisticated corporations, who both participated in the drafting process. Indeed, Jet, not Illinois National, proposed the 2008 wording change that is at issue. Here, there is no question of overreaching by one party against the other; both were mistaken.

Finally, as set forth above, no party can point to prejudice. *See* pp. 24–25, *supra*.

Although I can imagine a case in which the post-occurrence equities tip the other way, I see no basis here to bar this post-occurrence application for reformation of the 2008 Policy based on mutual mistake.

## IV.    CONCLUSION

Plaintiff Illinois National has carried its burden under Fed. R. Civ. P. 56 of showing that there is no genuine dispute of material fact as to the cause of action for reformation alleged in Count 2 of the Complaint. Accordingly, summary judgment will be entered in favor of the Plaintiff on Count 2. Plaintiff's and Defendants' motions for summary judgment are in all other respects denied. Plaintiff's motion to strike and motion in limine will be denied as moot.

Within seven days, the parties will submit a proposed order, granting and denying the motions as stated above, and containing specific proposed language for reformation of the 2008 Policy, in accordance with this opinion.

Dated: January 2Y, 2015

Hon. Kevin McNulty
United States District Judge